WISE & Co., INC., Appellant, *v.* WECOLINE PRODUCTS, INC., Respondent.

366

Argued May 26, 1941; decided July 29, 1941.

*Frederick E. Crane, Milton Greenebaum* and *Isidor Enselman* for appellant. By practical construction, the contract made by the cables and letters included the *force majeure* clause contained in the writing signed by the parties. (*Nicoll* v. *Sands,* 131 N. Y. 19; *Wirth & Hamid Fair Booking, Inc.,* v. *Wirth,* 240 App. Div. 413.) There is ample

evidence of a *force majeure* custom extending time for delivery, and the verdict is fully supported by the evidence. (*Turner Co.* v. *Robinson*, 55 Misc. Rep. 280; *Duncan* v. *Wohl, South & Co.*, 201 App. Div. 737; *Burd* v. *Bleischer*, 208 App. Div. 499; *Alsens A. P. C. Works* v. *Degnon Cont. Co.*, 222 N. Y. 34; *Greeff Engineering & Mfg. Co.* v. *Scourene Mfg. Co.*, 182 App. Div. 311; *Supple* v. *International Ry. Co.*, 208 App. Div. 547; *Ochs* v. *Woods*, 221 N. Y. 335; *Van Rensselaer* v. *Chism*, 186 App. Div. 557; *General Commercial Co., Ltd.*, v. *Butterworth-Judson Corp.*, 198 App. Div. 799; *Maurer Co.* v. *Tubeless Tire Co.*, 272 Fed. Rep. 990; *Blumenthal & Co.* v. *Gallert & Co.*, 240 N. Y. 217; *Peabody* v. *Speyers*, 56 N. Y. 230; *Mesibov, Glinert & Levy* v. *Cohen Mfg. Co.*, 245 N. Y. 305; *Marks* v. *Cowdin*, 226 N. Y. 138; *Spiegel* v. *Lowenstein*, 162 App. Div. 443.)

*Frank C. Laughlin, Joseph W. Kirkpatrick* and *Samuel J. Loewenstein* for respondent. There is no evidence in the record of a uniform custom of the trade to use the *force majeure* clause contained in the writing, or one having similar provisions, for the evidence conclusively establishes that numerous types of *force majeure* clauses containing substantially different terms as to the duties and obligations of the sellers and buyers were used in contracts for the purchase and sale of cocoanut oil from the Philippine Islands. (*Elenkrieg* v. *Siebrecht*, 238 N. Y. 254; *Shotwell* v. *Dixon*, 163 N. Y. 43; *Doniger* v. *Berger*, 241 App. Div. 23; *Freitag* v. *Franklin Fire Ins. Co.*, 242 App. Div. 241; *Matter of Case*, 214 N. Y. 199; *Getty* v. *Williams Silver Co.*, 221 N. Y. 34; *Russ* v. *Russ*, 263 N. Y. 625; *Lalor* v. *City of New York*, 208 N. Y. 431; *People* v. *Scharf*, 217 N. Y. 204.) A custom of the trade must be uniform and certain without varying or flexible terms. (*Manhattan Co.* v. *Morgan*, 242 N. Y. 38; *Federal Reserve Bank* v. *Malloy*, 264 U. S. 160; *Eckstein* v. *Schleimer*, 62 Misc. Rep. 635; *Sipperly* v. *Stewart*, 50 Barb. 62; *Oelricks* v. *Ford*, 23 How. [U. S.] 49; *Sickelco* v. *Union Pac. R. Co.*, 111 Fed. Rep. [2d] 746; *Martin* v. *State Highway Board*, 54 Ga. App. 856; *Porter-*

*field* v. *American Surety Co.*, 201 Mo. App. 119.) The verdict for the plaintiff cannot be sustained upon the theory of a practical construction of the contract by the parties. (*Lawrence* v. *Gallagher*, 73 N. Y. 613.) An alleged custom which has not been incorporated in or referred to in a memorandum of sale or written agreement is subject to the reasonable construction that the omission was to exclude the operation of the custom. (*Grace* v. *American Central Ins. Co.*, 109 U. S. 278; *Menage* v. *Rosenthal*, 175 Mass. 358; *Dant & Russell, Inc.*, v. *Grays Harbor Exportation Co.*, 106 Fed. Rep. [2d] 911; *Mengel & Bros. Co.* v. *Handy Chocolate Co.*, 10 Fed. Rep. [2d] 293; *City of Covington* v. *Kanawha Coal & Coke Co.*, 121 Ky. 681.)

DESMOND, J. The action is for damages for the alleged breach by defendant of a contract to purchase cocoanut oil from plaintiff. The dealings of the parties were through a broker. By cable messages, transatlantic telephone conversations, and correspondence, it was agreed in May, 1937, that plaintiff, a Philippine Islands corporation, should sell, and defendant, whose office is in New York city, should buy, 700 tons of this oil at a price fixed, shipment to be made during June, 1937. There was some dispute as to whether payment should be by a ninety-day draft or a sight draft, but the purchaser finally met the seller's demands in this respect, and furnished a sight draft. It seems to have been the uniform practice in the cocoanut oil trade that the terms of such agreements were negotiated as was done here, then later embodied in a formal written agreement. Looking to the preparation of such a formal writing, the broker cabled plaintiff: "We are familiar with the Cristobal form of contract do you want us to execute and send forward * * *." Plaintiff answered: "Leave you to arrange contract."

The so-called "Cristobal" form of contract, to which we shall refer again, was not used. The broker prepared a form which included this provision: "Seller shall not be responsible for non-delivery or delay in delivery when caused

by partial or total interruption of transportation facilities * * * or from any delay caused by inability to secure freight space * * * and in event of any delay in delivery from any such cause, this contract may at seller's option be extended for a like period equal to such delay." On or about May 14, 1937, defendant signed this agreement in New York city and arranged with a New York bank for the necessary credit to cover the sight draft. About a month later the agreement forwarded by the broker, reached plaintiff in Manila. Plaintiff signed and returned it with a letter informing the broker that the ship *Bengalen*, on which plaintiff had arranged to ship the oil, had been delayed by a grounding and subsequent dry docking and would not reach Manila until July 5th, so that June shipment was impossible. Parenthetically, the jury apparently found on sufficient evidence that plaintiff made reasonable efforts to procure other shipping space for a June sailing, but without success. Plaintiff through the broker, asked defendant to agree to an extension of time for shipment and to arrange an extension of the letter of credit to cover the delay. Defendant refused, claiming that plaintiff's failure to ship in June was a breach of contract. In the meantime the market price had dropped and plaintiff had to sell the oil to other purchasers at a substantial reduction from the price arranged with defendant.

Plaintiff sued, alleging a breach of the formal contract, which was attached to the complaint. Later plaintiff added a second cause of action for a breach of the agreement as made by the cablegrams and letters which covered price, quantity, shipping time, etc. In this added cause of action plaintiff included an allegation that there existed in the cocoanut oil trade a general usage and custom to the effect that if a seller was unable to make delivery in the stipulated time, for reasons beyond the seller's control, the time for delivery was extended for a period equal to the period of such delay. On the trial, plaintiff sought to prove this custom by the testimony of persons familiar with the cocoanut oil trade. At the close of plaintiff's case, defendant

moved to dismiss both causes of action as not established. The court, with plaintiff's consent, then struck out the first cause of action, on the written contract, but granted plaintiff's motion to amend the remaining cause of action by inserting in this remaining cause of action the allegations of the stricken cause of action as to the making of the formal agreement. As the matter was then left by this ruling, the contract sued upon was the one made out by the cablegrams and letters which had been, as plaintiff's counsel put it, " memorialized by a later instrument." The trial court's ground for holding that the formal written and signed instrument was not the contract between the parties, was that plaintiff, when it signed this paper containing the delay clause, knew that it could not deliver in June. This formal writing, the court said, did have significance, however, as evidence of what the contract was.

The court in his charge told the jury that there were two questions before it: *first*, was it the known and accepted custom of the trade that there be read into every such contract, an unavoidable delay, or *force majeure*, clause of the same import as the clause actually found in the written " memorial," and, *second*, did plaintiff, assuming the existence of such a custom, do everything it was required to do by such a custom. The jury was told that if it answered either question in the negative, plaintiff could not recover. The jury brought in a verdict for plaintiff. The Appellate Division, one justice dissenting, reversed and dismissed the complaint, holding that plaintiff had " failed to establish any uniform *force majeure* clause customary in the trade " and that " although some kind of a *force majeure* clause appears commonly to have been inserted in contracts for the sale of cocoanut oil, they differed in such important respects in their terms that it cannot be said that parties in the trade contracted with relation to any particular *force majeure* clause." (261 App. Div. 886.) This dismissal requires us to examine plaintiff's proofs.

The three experts who testified for plaintiff on this question of custom were in agreement that in such contracts

there was always expressed or implied some provision concerning unavoidable delays. In the testimony of each can be found language to the effect that the shipper when faced with such a delay, is entitled by fixed custom to an extension of time. But the testimony of these same experts, on cross-examination, leaves it at least doubtful whether the testimony of any one of them amounts to a clear statement of the existence in this trade of a custom so general, uniform and unvarying as to furnish a fixed and definite standard by which to ascertain the intention of the parties. (*Manhattan Co.* v. *Morgan*, 242 N. Y. 38, 53; *Federal Reserve Bank* v. *Malloy*, 264 U. S. 160, 170.) The so-called "Cristobal" form of contract which the broker suggested in one of the cablegrams, and which, while not used by the parties, is in the record as defendant's Exhibit D, contains no specific provision for an extension of time to the shipper for unavoidable delays but includes this language on the subject of delay: "Seller not to be responsible for nondelivery or delay in delivery resulting from any contingency beyond its control or its subsidiary company's control." That *force majeure* clause would seem not to bear out plaintiff's claim of a uniform custom of extending the delivery time, but to mean only that the shipper is not to be held liable for unavoidable delays.

However, while we may doubt the sufficiency of the proof as to an unvarying custom, we find proof that defendant agreed, by signing the formal contract, that as a usual term and condition of such contracts, plaintiff was entitled to an extension of time equal to the period of any unavoidable delay. The broker, before preparing the formal agreement, wrote defendant confirming its purchase, mentioning quantity, price, shipment in June, credit terms, etc., and adding the phrase: "usual terms and conditions." Thereafter the broker submitted to defendant the formal agreement containing the *force majeure* clause on which plaintiff now relies. The parties here concede that defendant's signature to this form of agreement did not bind it to the agreement, as such, when it later turned out that the

plaintiff in its turn, signed the paper knowing that it could not perform as to a shipment in June. But the written agreement and its *force majeure* provision is still in the case, at least as a memorial, or written record, of what the parties meant by " usual terms and conditions." It thus amounts to an admission by defendant that the *force majeure* clause in the writing was one of the " usual terms and conditions " of a shipment of cocoanut oil from the Philippine Islands to the United States, and thus part of the contract between the parties. Being an admission against defendant's interest of a fact favorable to plaintiff, it was evidence to which the jury could give such weight as seemed appropriate. (*Cook* v. *Barr*, 44 N.Y. 156, 158; *Reed* v. *McCord*, 160 N. Y. 330, 340; *Miller* v. *Silverman*, 247 N. Y. 447, 450.) The signature of defendant to the memorial, containing the *force majeure* clause, cannot be regarded as totally without significance. As the trial justice said, in denying defendant's motion to dismiss: " * * * I am very clear on it, that the instrument has only significance as evidence of what the other agreement was." With that writing before it, the jury could say, as it did by its verdict, that the clause was a customary one in the sense that it was one of the " usual terms and conditions," to which the parties had bound themselves informally, and that defendant was guilty of a breach when it refused the extension of time and refused to accept a July shipment.

The judgment of the Appellate Division should be reversed and that of the Trial Term affirmed, with costs in this court and in the Appellate Division.

LEHMAN, Ch. J. (dissenting). In May, 1937, the plaintiff, a corporation doing business in the Philippine Islands, agreed to sell to the defendant, a corporation doing business in the city of New York, 700 tons of cocoanut oil. The agreement was negotiated by Zimmerman, Alderson, Carr Co., oil brokers, who have an office in the city of New York. In their negotiations the parties communicated with each other by cable, telephone and mail. Under the terms of

the contract agreed upon in that manner, shipment was to be made during June, 1937, and payment of the stipulated price was to be made by means of a draft drawn under confirmed irrevocable banker's letter of credit to be established immediately by the buyer. After some dispute in regard to whether the draft should be a sight draft or a ninety-day draft, the buyer furnished a sight draft as demanded by the seller. The seller was unable to make shipments during June and the buyer refused to furnish an extension of the letter of credit to cover shipments made after the end of June.

After agreement had been reached in manner I have stated, the brokers submitted to both parties a written contract of purchase and sale. The contract contained a clause which permitted the seller to ship the oil after the end of June if unable to make such shipments during that month. No such clause had previously been discussed by the parties but both parties signed the written contract as submitted by the brokers. If the written contract signed by both parties were valid, the plaintiff would be entitled to recover damages caused to it by the defendant's failure to accept shipments made in accordance with the "*force majeure*" clause extending the stipulated time for shipment where shipment is prevented by causes beyond the control of the seller. Because the plaintiff signed that contract after the time when shipment during June could have been made in accordance with its terms, the trial court held that the *written* contract did not become effective, and dismissed, without objection by the plaintiff, the plaintiff's cause of action for damages caused by breach of that contract as alleged in the complaint in this action.

It is said, however, that the written contract was intended to be a memorial of the agreement previously made by cable, telephone and letter and that the plaintiff may recover damages under the earlier contract. The plaintiff recovered judgment upon that theory. Doubtless the evidence sufficiently establishes that the parties believed that they had arrived at a complete agreement for the purchase and sale of

the oil before the written contract was prepared. It was understood that the agreement so arrived at would thereafter be embodied in a formal written instrument which would integrate the negotiations and be the sole memorial of the agreement of the parties. The parties, doubtless, intended, however, that the agreement should be enforceable even before the written contract was signed. Only by consent of both parties could the written agreement add any terms to those agreed upon, but neither party was free to refuse to sign a contract which would embody those terms upon which there had been oral agreement. In this case the abortive signing of the written instrument does not change the legal rights of the parties under the previous agreement. If the parties had previously agreed expressly or impliedly that the contract for oil to be shipped in June should contain a proviso that shipment might be made later, the defendant has breached the contract and the plaintiff is entitled to damages  The plaintiff, in the second cause of action of its complaint, alleged that the informal agreement contained such a proviso.

There is evidence that in the cocoanut oil trade, a custom exists that after a broker has negotiated an agreement of purchase and sale of oil to be shipped from abroad, a formal contract is executed by the parties setting forth the terms and conditions upon which the parties have reached express agreement and in addition " usual terms and conditions," including a *force majeure* clause. In this case the brokers' notice of confirmation stated that the formal written contract would contain " usual terms and conditions." There is also testimony that some *force majeure* clause was usually, if not invariably, incorporated in every written contract. To establish a cause of action the plaintiff must show not only that the parties understood that *some form of force majeure clause* was usual but also that the usual and customary form not only excused failure to perform by the seller within the stipulated time where performance was impossible, but extended the time during which performance might be made.

The jury found that the *force majeure* clause, incorporated in the written instrument which was signed by both parties, was the usual and customary clause to which both parties impliedly agreed. The Appellate Division reversed the judgment in plaintiff's favor and dismissed the complaint, holding that there was no evidence to sustain the finding. Experts who testified as witnesses for the plaintiff showed that it was customary to insert some *force majeure* clause in every contract, but it clearly appears, even from their testimony, that the nature of the *force majeure* provision varied in the different contracts. In some contracts the clause provided that performance by the seller of an agreement to ship at a stipulated time would be excused where performance is not possible. In other contracts impossibility of performance at the stipulated time would automatically extend the time for shipment, so that when performance thereafter became possible the seller would be required to ship and the buyer would be required to accept and pay for the oil at the agreed price. By fair implication we may read into the contract of purchase and sale of oil to be shipped in June, a clause which would permit performance in July only if such a clause is so usual that inference would be justified that the obligation for June shipment was made subject to such a condition. A majority of the court agree, I think, with the Appellate Division that the testimony of the witnesses who are connected with the oil trade is insufficient to prove that.

We are told, however, that though the written instrument has no force as a new convention of the parties, it is still in the case, with its *force majeure* provisions, " at least as a memorial, or written record, of what the parties meant by ' usual terms and conditions.' It thus amounts to an admission by defendant that the *force majeure* clause in the writing was one of the ' usual terms and conditions ' of a shipment of cocoanut oil from the Philippine Islands to the United States, and thus part of the contract between the parties." The written contract embodies those terms which the parties were willing to accept, but under the circumstances of this

case acceptance by the defendant of the *force majeure* clause does not indicate that the clause was part of the original agreement. The evidence that before preparing the formal writing the broker cabled the plaintiff, "We are familiar with the Cristobal form of contract do you want us to execute and send forward * * *," and that plaintiff answered, " Leave you to arrange contract," shows conclusively that the broker and the parties understood that preparation of the formal writing involved more than formulation of terms previously agreed upon expressly or by necessary implication, but required choice of terms which would be acceptable to the parties in amplification of what had already been agreed to. The " Cristobal " form of contract contains a *force majeure* clause quite different from the *force majeure* clause eventually embodied in the written contract. The parties, not having agreed impliedly to accept the Cristobal form or any other particular form were still free to determine what *force majeure* clause would be acceptable. The fact that the defendant did accept a particular form which would have permitted an extension is evidence that it was willing to accept such a clause at that time. It is no evidence that the defendant had agreed to such a clause before. The evidence, in my opinion, shows beyond possibility of dispute that the parties had not so agreed earlier.

Judgment should be affirmed.

LOUGHRAN, FINCH, RIPPEY and LEWIS, JJ., concur with DESMOND, J.; LEHMAN, Ch. J., dissents in opinion in which CONWAY, J., concurs.

Judgment accordingly. (See 286 N. Y. 699.)