BELASCO THEATRE CORPORATION, Respondent, *v.* JELIN PRODUCTIONS, INC., Appellant, et al., Undertenants.

First Department, December 14, 1945.

*Jonas J. Shapiro* of counsel (*Jerome Handler* with him on the brief; *Greenbaum, Wolff & Ernst,* attorneys), for appellant.

*Francis S. Levien* of counsel (*Stuart H. Steinbrink* with him on the brief; *Levien, Singer & Neuburger,* attorneys), for respondent.

CALLAHAN, J. The respondent landlord has been awarded possession of the premises known as the Belasco Theatre, in the borough of Manhattan, city of New York, upon the theory that the appellant tenant held over after forfeiture for breach of a covenant contained in an option granted by the tenant to the landlord, permitting the landlord to designate plays to be presented at the theatre. The option was contained in certain written modifications of the lease executed by the parties. For the purposes of this appeal we are assuming that the option was contained in and was part of the lease, and that it was a condition, for a breach of which a forfeiture would result.

The terms of the option provided: " The Tenant hereby gives to the Landlord, its successors and assigns the sole and exclusive right, at any time, and from time to time, during the continuance of the lease, to book the demised premises from the Tenant upon the usual and customary terms of booking arrangements prevailing in the theatrical industry * * *."

" To book " concededly means to sublease the theatre for theatrical performances.

There is no dispute that the respondent-landlord, prior to the expiration of the option, gave sufficient notice of its intention to designate a certain play, but that the appellant-tenant had already contracted to put another play into the theatre.

Appellant-tenant does not contend that an option containing the clause " usual and customary terms " would be *ipso facto* indefinite because of the use of those words. It does contend, however, that the evidence establishes without contradiction that the financial terms of booking arrangements of theatres in the city of New York varied in many appreciable respects, that

they were required to be the subject of negotiation, and, there-fore, the option was indefinite and constituted no more than an agreement to agree. The position taken by appellant obviates the necessity of determining whether the option itself is enforc-ible for indefiniteness, and limits our task to an examination of the proof in order to determine the sufficiency thereof.

It is to be noted that the option contained none of the essen-tial financial terms for the booking or subleasing of a theatre. Nothing specific was mentioned with respect to the length of the term, the amount of rent to be fixed, nor any of the other usual and necessary provisions of a sublease.

The respondent-landlord called four expert witnesses. They were substantially in accord in testifying that it was " usual and customary " to let theatres in New York City on a basis of a division of profits rather than for a fixed rent. It was said that the percentages generally were 35% to the owner and 65% to the producer up to a certain figure, and a division of 30% and 70%, over all, thereafter. The owner was required to fur-nish the theatre with heat, lights, tickets, etc., and to pay part of the first thousand dollars spent on advertising. These wit-nesses also agreed that it was " usual and customary " that all theatre lettings contain at least four basic provisions: (1) a " stop clause," meaning that if the gross weekly receipts of a play were under a specific figure, then either party might terminate the engagement; (2) a " break figure," by which was meant a sum at which the percentage figures changed to the overall figures of 30% and 70%; (3) a " guarantee " or minimum weekly sum that the theatre owner was to receive, and (4) provisions for the number of stage hands to be fur-nished by the theatre owner.

The testimony of these witnesses showed, however, that there were no fixed or definite figures or amounts which were " usual and customary " with respect to any of these four basic provisions. The figures for the " stop clause " were stated to be " about ten, eleven or twelve thousand dollars," or that " through negotiation " the figure " may vary a thousand dollars or so."

The " break figure," the witnesses said, variously, would " probably be fourteen or fifteen thousand dollars ", and may be " fifteen thousand dollars or thereabouts " and " approxi-mately fourteen, fifteen thousand dollars."

As to the guarantee, one witness said that it " is usually about $3,500," and again, " it may be between three thou-sand and thirty-five hundred." Another witness admitted that " the usual and customary term of a booking arrangement pro-

vides for a guarantee with a sliding scale from thirty-five hundred down." Still another witness said, in effect, that the figure for a guarantee had been $3,000 two years ago, but since running costs had advanced, a higher guarantee was exacted.

As to the fourth customary provision with respect to the number of stage hands, the testimony showed it usually was four hands for a " one-set " show, but for more than a one-set show, as one witness said, " maybe two or three more stage hands or sometimes not at all." Another stated as to stage hands " the theatre supplies three — four men " for a one-set show and " it would be a question of another man or two at the very most " for a two-set show.

These and other variances appear throughout the testimony of the respondent-landlord's expert witnesses as to the basic provision for customary financial terms. There were frequent admissions on cross-examination that the amounts of money involved in each basic provision were always subject to negotiation.

A printed form of contract for booking of shows was produced by the respondent-landlord, but the witnesses admitted that other forms were frequently used and sometimes certain clauses were stricken out or were subject to negotiation.

What the respondent-landlord was claiming in attempting to dispossess the appellant-tenant, was a forfeiture for breach of an enforcible contract in the form of an option. Therefore, even upon the assumption that the option providing for the right to book a theatre " upon the usual and customary terms of booking arrangements prevailing in the theatrical industry " was not too indefinite or vague in itself in order to be enforcible, it was required to be supported by proof showing the existence in the theatrical industry in New York of fixed and invariable terms applicable to all theatre bookings. We must hold that the proof here fell far short of meeting these requirements. To establish merely a range with minimum and maximum figures within which the parties could negotiate, does not meet the test of definiteness essential to establish an enforcible contract.

In *St. Regis Paper Co.* v. *Hubbs & Hastings P. Co.* (235 N. Y. 30, 36) the rule is stated as follows: " But one element of the contracts was left open to future negotiations. Prices were to be fixed by mutual agreement and if the parties did not agree, the contracts were to terminate. These terms are so indefinite as to have no legal significance; they amount to nothing more than an agreement to make a future agreement; an agreement to agree is not enforcible. Plaintiff exercised its legal right in refusing to be bound thereby."

A custom or usage, if it is to be read into a contract to ascertain the intention of the parties, must fix a definite standard by proof establishing that it was general, uniform and unvarying (*Wise & Co., Inc.*, v. *Wecoline Products, Inc.*, 286 N. Y. 365).

In *Matter of Gerseta Corp.* v. *Silk Assn. of America* (220 App. Div. 293, 295) the court adopted the statement of the rule as to the degree of proof required to establish a custom set forth in the earlier case of *Sipperly* v. *Stewart* (50 Barb. 62) where the following language was used: "'A custom, in order to become a part of a contract, must be so far established and so far known to the parties, that it must be supposed that their contract was made in reference to it. For this purpose the custom must be established, and not casual — uniform and not varying — general and not personal, and known to the parties.'"

Cases such as *1240 Third Ave., Inc.* v. *Birns* (232 App. Div. 522) are of no assistance to the respondent-landlord. There the essential financial terms had been fixed in an agreement for the sale of real property of which the purchaser was to give back a long term lease. The names of the lessor and lessee were specified, the property to be leased was described, the length of the term set out, the amount of rents was fixed, and the date when the term was to commence was set forth. The agreement then provided for the making of a lease containing the " usual clauses " used by rental brokers in that vicinity. This court pointed out that no essential term was omitted or left in doubt, and a formal document embodying them could readily be drawn and executed with the addition of the " usual clauses " found in the " stereotyped form " of lease well understood by real estate brokers in the vicinity. We have no such situation here. Even after the receipt of the proof as to alleged " usual and customary terms," many of the essential financial terms are still in doubt.

Under the circumstances it was improper for the Municipal Court to award a final order of dispossess on the theory of breach of an enforcible contract for forfeiture.

The determination of the Appellate Term and the final order of the Municipal Court should be reversed and the petition dismissed, with costs and disbursements to the appellant in all courts.

MARTIN, P. J., DORE, COHN and PECK, JJ., concur.

Determination of the Appellate Term and final order of the Municipal Court unanimously reversed and the petition dismissed, with costs and disbursements to the appellant in all courts. [See *post,* p. 760.]