08-5668-cv
Co. of New York v.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2009

(Argued:  November 20, 2009  Decided: February 19, 2010)

Docket No. 08-5668-cv

_____

LAW DEBENTURE TRUST CO. OF NEW YORK,

Plaintiff-Appellant,

- v. -

MAVERICK TUBE CORP. and TENARIS S.A.,

Defendants-Appellees.

_____

Before: KEARSE, KATZMANN, and LIVINGSTON, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, Richard J. Sullivan, Judge, dismissing action brought on behalf of holders of certain notes, issued by defendant Maverick Tube Corp., for breach of contract, unjust enrichment, and tortious interference with contract with respect to Maverick's refusal to allow the noteholders to convert their notes to cash and stock following the acquisition of Maverick by defendant Tenaris S.A.

Affirmed.

PHILIP C. KOROLOGOS, New York, New York (Eric Brenner, Boies, Schiller & Flexner, New York, New York, on the brief), for Plaintiff-Appellant.

RICHARD J. UROWSKY, New York, New York (Sergio J. Galvis, Stephanie G. Wheeler, Sullivan & Cromwell, New York, New York, on the brief), for Defendants-Appellees.

KEARSE, Circuit Judge:

The present litigation concerns the conversion rights of certain holders of convertible notes issued by defendant Maverick Tube Corp. ("Maverick" or the "Company") pursuant to an indenture agreement. Plaintiff Law Debenture Trust Co. of New York, which succeeded original plaintiff Bank of New York as the indenture trustee (collectively the "Trustee"), appeals from a judgment of the United States District Court for the Southern District of New York, Richard J. Sullivan, Judge, dismissing its claim against Maverick for breach of contract in refusing to allow the noteholders to convert their notes to cash and stock following the acquisition of Maverick by defendant Tenaris S.A. ("Tenaris"), and dismissing its claims against Tenaris for tortious interference with contract and unjust enrichment. The district court granted summary judgment in favor of defendants on the ground that the conversion rights that would have arisen upon the acquisition of Maverick by a company whose common stock is traded on a United States national securities exchange were not triggered by Maverick's acquisition by Tenaris, which has only American Depositary Shares (or "ADSs") traded on the New York Stock Exchange (or "NYSE"). On appeal, the Trustee contends principally that the district court erred in ruling as a matter of law that

- 2 -

the trading of Tenaris ADSs is not the trading of its common stock within the meaning of the indenture. For the reasons that follow, we affirm.

I. BACKGROUND

The facts are largely undisputed. The following description is drawn principally from the parties' statements of material facts filed pursuant to the district court's Local Rule 56.1 and from the contract documents themselves--to wit, the notes and the indenture--whose language is not in dispute.

A. The Maverick Notes and Indenture; the Tenaris Acquisition

In 2003, Maverick, a United States manufacturer of tubing used in the oil and gas industry, raised capital by issuing debt securities (the "'03 Notes"). In 2004, Maverick solicited holders of the '03 Notes to exchange them for new convertible debt securities denominated "2004 4.00% Convertible Senior Subordinated Notes due 2033" (the "New Notes" or the "'04 Convertible Notes") to be issued pursuant to an indenture agreement (the "Indenture"). The New Notes provide that, "[s]ubject to the procedures set forth in the Indenture, a Holder may convert Notes into cash and, if applicable, shares of Common Stock . . . after the occurrence of a Public Acquirer Change of Control." ('04 Convertible Notes ¶ 10(g).) The terms used in this provision are defined in the Indenture.

"'Common Stock' means the common stock, par value $.01 per share, of the Company" (Indenture § 1.01, at 3), the "'Company'" being defined as "Maverick" (id.). "Public Acquirer," to the extent pertinent here,

> means a Person who (i) acquires the Company or all or substantially all of the Company's assets in a consolidation, merger, share exchange, sale of all or substantially all of the Company's assets or other similar transaction and (ii) has a class of common stock traded on a United States national securities exchange . . . .

(Id. at 10 (emphasis added).) The term "Public Acquirer Change of Control" is defined as "any Non-Stock Change of Control involving a Public Acquirer." (Id.) "Non-Stock Change of Control" is defined to include any merger, sale, or other transfer of all or substantially all of Maverick's assets in exchange for consideration "other than" common stock traded on a United States national securities exchange. (Id. at 8.) After there has been a Public Acquirer Change of Control, any right that the noteholder had to convert his notes into cash and Common Stock of Maverick becomes a right to convert the notes into cash and the acquirer's common stock referred to in the Public Acquirer definition. (See Indenture §§ 7.06(f), 1.01, at 10.)

Tenaris is a joint stock corporation organized under the laws of Luxembourg. It issues "ordinary shares," which are common stock. In 2002, Tenaris entered into an agreement with a United States bank ("Bank" or "Depositary Bank") pursuant to which Tenaris deposited a number of its ordinary shares with the Bank, and the Bank issued American Depositary Receipts ("ADRs"), with

- 4 -

each ADR evidencing an American Depositary Share. That agreement provided that each ADS represented the right to receive a specified number of ordinary Tenaris shares and a pro rata share of any other property or securities deposited with the Bank. Tenaris ADSs are traded on the New York Stock Exchange.

In June 2006, Maverick and Tenaris announced that they had entered into a merger agreement pursuant to which Tenaris would acquire all of Maverick's common stock for $65 per share in cash. With respect to whether the anticipated merger would trigger the conversion rights of holders of the '04 Convertible Notes under the Indenture's Public Acquirer Change of Control provision ("PACC Provision"), Maverick filed a report with the Securities and Exchange Commission ("SEC") stating that Maverick did "not believe that Tenaris qualifie[d] as a Public Acquirer for such purposes because Tenaris common stock is not traded on a United States national securities exchange." Following the October 2006 consummation of the merger, some holders of the '04 Convertible Notes nonetheless tendered their notes for conversion pursuant to the PACC Provision. Although Maverick notified noteholders that they were entitled, until the close of business on December 14, 2006, to convert their notes into cash at the rate of $2,226.79 per $1,000 principal amount pursuant to a different provision, it refused to convert notes under the PACC Provision.

B. The Present Action

In December 2006, the Trustee commenced the present action on behalf of holders of the '04 Convertible Notes against Maverick and Tenaris, seeking a declaratory judgment that the acquisition constituted a Public Acquirer Change of Control, damages from Maverick for breach of the Indenture, and damages from Tenaris for tortious interference with contract and unjust enrichment. The Trustee moved for partial summary judgment with respect to its request for a declaratory judgment on its breach-of-contract claim; Maverick and Tenaris moved for, inter alia, summary judgment dismissing all of the Trustee's claims.

In a Memorandum and Order dated October 15, 2008 ("District Court Opinion"), the district court denied the Trustee's motion for partial summary judgment and granted the motion of Maverick and Tenaris for summary judgment dismissing the complaint in its entirety. With respect to the contract claim, the court noted that "[t]he parties have each moved for summary judgment on the declaratory judgment and breach of contract claims, and each contends that there are no material issues of fact. The Court agrees that there are no material disputed issues of fact . . . ." District Court Opinion at 11.

As to the merits of the contract claim, the court found the relevant terms of the Indenture to be unambiguous and hence appropriate for interpretation as a matter of law, stating as follows:

> The question before the Court is whether Tenaris is a "Public Acquirer" for purposes of the PACC

Provision in the Indenture. In turn, the question of whether Tenaris is a "Public Acquirer" turns on whether Tenaris "has a class of common stock traded on a United States national securities exchange . . . ." (Defs.' 56.1 ¶ 11.) Only if Tenaris is deemed to be a Public Acquirer is the PACC Provision triggered and the holders of the Notes entitled to the benefits of that provision. Plaintiffs argue that because Tenaris trades its stock in the form of ADSs on the NYSE, Tenaris has a class of common stock listed on a United States stock exchange and is thus a Public Acquirer. Defendants assert that Tenaris is not a Public Acquirer precisely because it is not listed on the NYSE but instead trades in the form of ADSs.

For purposes of background, the Court notes that in order for a foreign corporation to trade on the American stock exchange without listing its ordinary shares on the exchange, the foreign corporation must issue and deposit American Depositary Shares or ADSs with an American financial institution. See Kingdom 5-KR-41, Ltd. v. Star Cruises PLC, Nos. 01 Civ. 2946 (DLC) et al., 2004 WL 1944457, at *1 n.1 (S.D.N.Y. Aug. 31, 2004). The depositary institution then issues American Depositary Receipts or ADRs to the beneficial owners of the ADSs, who are then free to sell the ADSs on American securities exchanges. Id. The listing of ADSs on an American exchange "makes trading an ADR simpler and more secure for American investors than trading in the underlying security in the foreign market." In re Nat'l Australia Bank Sec. Litig., No. 03 Civ. 6537 (BSJ), 2006 WL 3844465, at *1 n.3 (S.D.N.Y. Oct. 25, 2006) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 367 (3d Cir. 2002)).

ADSs share several of the same characteristics as ordinary shares. For example, "ADRs are tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the [federal securities laws.]" Id., at *1 n.3. However, there are important differences between ADSs and ordinary shares. A holder of an ADS "is not the title owner of the underlying shares; the title owner of those shares is either the depositary, the custodian, or their agent." Id. Similarly, an ADS "represents an ownership interest in a foreign deposited security," whereas "a share of stock represents an ownership interest in a corporation, that has been deposited

- 7 -

with a depository, such as a United States bank or trust company." In re Vivendi Universal, S.A., 381 F. Supp. 2d 158, 171 (S.D.N.Y. 2003) (citing SEC, American Depository Receipts, 1991 WL 294145, at *2 (S.E.C. May 23, 1991)).

The Court finds that the unambiguous terms of the contract demonstrate that ADSs are not included in the definition of "common stock" for purposes of the Public Acquirer definition. First, the Court finds that the term "common stock" is unambiguous. The Indenture defines common stock as "the common stock, par value $.01 per share, of the Company [Maverick Tube]" and does not include ADSs. Second, the Court also finds that common stock means the same thing as "ordinary shares"--in fact, Plaintiff itself admits that Tenaris's "ordinary shares" are the same as "common stock." (Pl.'s 56.1 ¶ 27.) The Indenture clearly differentiates between "ordinary shares" and ADSs. For example, the term "Capital Stock" is defined in the Indenture to include "any and all shares (including ordinary shares or American depositary shares). . . ." (Wheeler Decl. Ex. A § 1.01.) Finally, it is clear that, had the drafters wanted to include ADSs in the definition of common stock, they could have. The definition of the term "Fundamental Change" in the Indenture (see id.) includes the phrase "Capital Stock traded on a national securities exchange," which suggests that the drafters understood the difference between the implications of that phrase, which would include ADSs, and the phrase "common stock traded on a United States national securities exchange," which would not include ADSs. Thus, while it may be true that ADSs are treated similarly to common stock as Plaintiff contends, the Court finds that, based on the unambiguous terms of the Indenture, they are two different terms with different meanings, describing different types of securities. Accordingly, the Court finds that Tenaris does not have a class of common stock traded on a United States national securities exchange, and is thus not a Public Acquirer for purposes of the Indenture.

District Court Opinion at 11-13 (emphasis and brackets in original). Accordingly, the court concluded that defendants were entitled to summary judgment dismissing the Trustee's breach-of-contract claim.

- 8 -

The district court also dismissed the Trustee's claims against Tenaris. With respect to the claim of tortious interference with contract, the court noted that in order to recover on such a claim a plaintiff must establish, inter alia, an actual breach of the contract. Having ruled that Maverick did not breach the Indenture, the court concluded that the Trustee could not prevail on its tortious-interference-with-contract claim. See id. at 13. The court dismissed the Trustee's unjust enrichment claim against Tenaris on the grounds (a) that "a claim for unjust enrichment, even against a third party, cannot proceed when there is an express agreement between two parties governing the subject matter of the dispute," and (b) that, there having been no breach by Maverick, Tenaris's causing, aiding, or abetting Maverick's refusal to convert the New Notes did not enrich Tenaris unjustly. Id. at 14.

Judgment was entered in favor of defendants, and this appeal followed.


II. DISCUSSION


On appeal, the Trustee contends the district court erred in dismissing its contract and tortious-interference-with-contract claims. It makes no argument with regard to its claim for unjust enrichment, and we thus regard any challenge to the dismissal of that claim as waived. See generally Otero v. Bridgeport Housing Authority, 297 F.3d 142, 144 (2d Cir. 2002); Day v. Morgenthau,

- 9 -

909 F.2d 75, 76 (2d Cir. 1990). As to the contract claim, the Trustee contends that it was entitled to partial summary judgment, arguing principally that "The Undisputed Evidence Shows, and the District Court Found, That Tenaris Has 'a Class of Common Stock Traded on a United States National Securities Exchange'" (Trustee's brief on appeal at 23), and that in granting summary judgment in favor of defendants the district court adopted an interpretation of the Public Acquirer definition that disregarded custom and usage evidence and was commercially unreasonable (see, e.g., id. at 18). The Trustee's contention that the dismissal of its tortious-interference-with-contract claim was erroneous rests, explicitly, on its premise that the dismissal of its contract claim was erroneous. (See id. at 51-52.) For the reasons that follow, we reject all of the Trustee's contentions.

A. Contract and Summary Judgment Principles

Under New York law, which the parties agree is controlling here, the initial question for the court on a motion for summary judgment with respect to a contract claim is "whether the contract is unambiguous with respect to the question disputed by the parties." International Multifoods Corp. v. Commercial Union Insurance Co., 309 F.3d 76, 83 (2d Cir. 2002) ("International Multifoods"); see, e.g., Beth Medrash Eeyun Hatalmud v. Spellings, 505 F.3d 139, 146 (2d Cir. 2007) ("Beth Medrash"); Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987). The matter of whether the contract is ambiguous is a

question of law for the court. See, e.g., International Multifoods, 309 F.3d at 83; Bailey v. Fish & Neave, 8 N.Y.3d 523, 528, 837 N.Y.S.2d 600, 603 (2007) ("Bailey"); Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 569 (2002) ("Greenfield"); W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (1990) ("W.W.W. Associates").

An ambiguity exists where the terms of the contract "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." International Multifoods, 309 F.3d at 83 (internal quotation marks omitted). Evidence as to such custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized. See, e.g., Fox Film Corp. v. Springer, 273 N.Y. 434, 8 N.E.2d 23 (1937). When the parties have used contract terms which are "in common use in a business or art" and have "a definite meaning understood by those who use them," but which "convey no meaning to [t]hose who are not initiated into the mysteries of the craft," the parties, in order to have the court construe their contracts, "must furnish [the court] with the dictionaries they have used." Id. at 436, 8 N.E.2d at 24. In such circumstances, the court "must be informed of the meaning of the language as generally understood in that business, in the

- 11 -

light of the customs and practices of the business." Id. at 437, 8 N.E.2d at 24.

Proof of custom and usage does not mean proof of the parties' subjective intent, for "[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous," Greenfield, 98 N.Y.2d at 569, 750 N.Y.S.2d at 569; see, e.g., Bailey, 8 N.Y.3d at 528, 837 N.Y.S.2d at 603. Rather, proof of custom and usage consists of proof that the language in question "is 'fixed and invariable' in the industry in question." Hutner v. Greene, 734 F.2d 896, 900 (2d Cir. 1984) (quoting Belasco Theatre Corp. v. Jelin Productions, Inc., 270 A.D. 202, 205, 59 N.Y.S.2d 42, 45 (1st Dep't 1945)).

> The trade usage must be "so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto."

British International Insurance Co. v. Seguros La Republica, S.A., 342 F.3d 78, 84 (2d Cir. 2003) (quoting Reuters Ltd. v. Dow Jones Telerate, Inc., 231 A.D.2d 337, 343-44, 662 N.Y.S.2d 450, 454 (1st Dep't 1997)). Thus, the proffered custom or usage must establish that the meaning of the term in question "was general, uniform and unvarying." Belasco Theatre Corp. v. Jelin Productions, Inc., 270 A.D. at 206, 59 N.Y.S.2d at 45.

> A custom, in order to become a part of a contract, must be so far established and so far known to the parties, that it must be supposed that their contract was made in reference to it. For this purpose the custom must be established, and not casual, uniform and not varying, general and not personal, and known to the parties.

_Id_., 59 N.Y.S.2d at 46 (internal quotation marks omitted) (emphases added).

In sum, "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing," _W.W.W. Associates_, 77 N.Y.2d at 162, 565 N.Y.S.2d at 443; evidence as to custom and usage is considered, as needed, to show what the parties' specialized language is "'fair[ly] presum[ed]'" to have meant, _British International Insurance Co. v. Seguros La Republica, S.A._, 342 F.3d at 84 (quoting _Reuters Ltd. v. Dow Jones Telerate, Inc._, 231 A.D.2d at 344, 662 N.Y.S.2d at 454).

No ambiguity exists where the contract language has "'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" _Hunt Ltd. v. Lifschultz Fast Freight, Inc._, 889 F.2d 1274, 1277 (2d Cir. 1989) ("_Hunt_") (quoting _Breed v. Insurance Co. of North America_, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355 (1978)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation," _Hunt_, 889 F.2d at 1277, unless each is a "reasonable" interpretation, _Seiden Associates, Inc. v. ANC Holdings, Inc._, 959 F.2d 425, 428 (2d Cir. 1992) ("_Seiden_"); _see_, _e.g._, _K. Bell & Associates v. Lloyd's Underwriters_, 97 F.3d 632, 637 (2d Cir. 1996); _Readco, Inc. v. Marine Midland Bank_, 81 F.3d 295, 299 (2d Cir. 1996) ("no ambiguity exists where the

alternative construction would be unreasonable"). Thus, the court should not find the contract ambiguous where the interpretation urged by one party would "strain[] the contract language beyond its reasonable and ordinary meaning." Bethlehem Steel Co. v. Turner Construction Co., 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93 (1957).

Where the parties dispute the meaning of particular contract clauses, the task of the court "is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement,'" Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting W.W.W. Associates, 77 N.Y.2d at 163, 565 N.Y.S.2d at 443); and "where consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity," Readco, Inc. v. Marine Midland Bank, 81 F.3d at 300; see, e.g., Hudson-Port Ewen Associates, L.P. v. Kuo, 78 N.Y.2d 944, 945, 573 N.Y.S.2d 637, 637 (1991). For example, in W.W.W. Associates, which involved a dispute as to whether a sales contract provision stating that either the purchaser or the seller could terminate the contract at a certain time conferred that right only on the purchaser, the New York Court of Appeals noted that the contract, negotiated by sophisticated businessmen, contained other provisions that expressly bestowed certain options on the purchaser alone. The Court concluded that any ambiguity in the disputed provision was resolved by consideration of the contract in its entirety and recognition of the contrasting provisions

adopted by the parties. See 77 N.Y.2d at 162-63, 565 N.Y.S.2d at 443-44.

"As a general matter, the objective of contract interpretation is to give effect to the expressed intentions of the parties," Hunt, 889 F.2d at 1277 (emphasis added); "[t]he best evidence of what parties to a written agreement intend is what they say in their writing," Greenfield, 98 N.Y.2d at 569, 750 N.Y.S.2d at 569 (internal quotation marks omitted). "Thus, a written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms," id., "without the aid of extrinsic evidence," International Multifoods, 309 F.3d at 83 (internal quotation marks omitted); see, e.g., Network Publishing Corp. v. Shapiro, 895 F.2d 97, 99 (2d Cir. 1990) ("[w]e must consider the words [of a contract] themselves for they are always the most important evidence of the parties' intention" (internal quotation marks omitted)); Bailey, 8 N.Y.3d at 528, 837 N.Y.S.2d at 603 ("[w]here the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language" (internal quotation marks omitted)).

The court should read the integrated contract "as a whole to ensure that undue emphasis is not placed upon particular words and phrases," Bailey, 8 N.Y.3d at 528, 837 N.Y.S.2d at 603, and "to safeguard against adopting an interpretation that would render any individual provision superfluous," International Multifoods, 309 F.3d at 86 (internal quotation marks omitted). Further, the

"courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." Bailey, 8 N.Y.3d at 528, 837 N.Y.S.2d at 603 (internal quotation marks omitted). "[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." Greenfield, 98 N.Y.2d at 569-70, 750 N.Y.S.2d at 570; see, e.g., Breed v. Insurance Co. of North America, 46 N.Y.2d at 355, 413 N.Y.S.2d at 355 ("court[s] may not make or vary the contract . . . to accomplish [their] notions of abstract justice or moral obligation").

We review de novo both the district court's determination of whether a contract is ambiguous, see, e.g., Beth Medrash, 505 F.3d at 145; Seiden, 959 F.2d at 428; Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d at 263, and, as to an unambiguous contract, the district court's interpretation of its terms, see, e.g., Beth Medrash, 505 F.3d at 145; Seiden, 959 F.2d at 429; Network Publishing Corp. v. Shapiro, 895 F.2d at 99.

We also review de novo the grant or the denial of a motion for summary judgment, drawing all reasonable factual inferences in favor of the party against which summary judgment is sought. See, e.g., SR International Business Insurance Co. v. World Trade Center Properties, LLC, 467 F.3d 107, 118 (2d Cir. 2006); British International Insurance Co. v. Seguros La Republica, S.A., 342 F.3d at 81; International Multifoods, 309 F.3d at 82. When both

- 16 -

sides have moved for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir. 2001); see, e.g., Schwabenbauer v. Board of Education, 667 F.2d 305, 314 (2d Cir. 1981).

B. The Provisions of the Maverick Indenture

Within the above legal framework, we see no error in the district court's determinations that the PACC Provision of the Indenture is unambiguous, and that, although the Tenaris "ordinary shares" are, undisputedly, the same as common stock, Tenaris was not a Public Acquirer within the meaning of the Indenture because the Tenaris securities that are traded on the New York Stock Exchange are not the Tenaris ordinary shares.

Preliminarily, we note that the Trustee's assertion that "the District Court Found[] That Tenaris Has 'a Class of Common Stock Traded on a United States National Securities Exchange'" (Trustee's brief on appeal at 23) is squarely contradicted by the district court's opinion itself. Although the quoted language appears in passages of the court's opinion that describe the Public Acquirer definition or the Trustee's contention, the Trustee provides no citation for its assertion that the court so "[f]ound." Indeed, the court's ruling stated quite plainly that "the Court finds that Tenaris does not have a class of common stock traded on a United States national securities exchange, and

- 17 -

is thus not a Public Acquirer for purposes of the Indenture," District Court Opinion at 13 (emphasis added).

Our *de novo* review of the record persuades us that the district court correctly determined that the phrase "common stock traded on a United States national securities exchange" in the Indenture's Public Acquirer definition, when read in the context of the Indenture as a whole, unambiguously does not include American Depositary Shares traded on such an exchange. The Indenture's sole definition of "common stock" does not mention ADSs. It states only that "'Common Stock' means the common stock, par value $.01 per share, of the Company [defined as Maverick]" (Indenture § 1.01, at 3). The Indenture does not provide a definition of common stock in general.

The Indenture does, however, contain direct and indirect references to American Depositary Shares in other provisions. The most pertinent provisions are those dealing with "Fundamental Change[s]" prior to June 15, 2011, that would entitle a noteholder to require Maverick to purchase his notes for cash (*see* *id.* § 4.01). A "Fundamental Change" is defined to include "consummation of any . . . merger of the Company pursuant to which [its] Common Stock will be converted into cash, securities or other property" (*id.* § 1.01, at 5), but to exclude a merger in which "at least 90% of the consideration . . . consists of shares of Capital Stock traded on a national securities exchange" (*id.* at 6 (emphasis added)). The Indenture's definition of Capital Stock

- 18 -

expressly includes ADSs, and indeed refers to ADSs and ordinary shares in the disjunctive:

> "Capital Stock" of any Person means any and all shares (including ordinary shares or American depositary shares), interests, participations or other equivalents however designated of corporate stock or other equity participations . . . of such Person . . . .

(Id. at 2 (emphases added).)

The parties could easily have included in the Indenture a definition of common stock in general with a parenthetical phrase expressly including ADSs, such as the parenthetical in the definition of "Capital Stock"; or they could have included such a parenthetical after "common stock" in the "a class of common stock traded on a United States national securities exchange" clause of the Public Acquirer definition. They did neither. Given that the parties defined more than 100 terms in the Indenture and made explicit reference to ADSs in the "Capital Stock" definition that informs the rights of noteholders to require Maverick to purchase their notes, the Indenture as a whole does not suggest that the undefined term "common stock," in the Public Acquirer definition that informs noteholders' conversion rights, includes ADSs implicitly.

The Trustee argues that the undefined and unadorned phrase "common stock traded on a United States national securities exchange" in the Public Acquirer definition should be deemed to include American Depositary Shares that trade on such an exchange because, as a matter of custom and usage, the trading of ADSs is a form of trading common stock. But the evidence proffered by the

- 19 -

Trustee falls well short of showing any "uniform and unvarying," "general and not personal" custom so well established that the parties must be presumed to have meant the term "common stock" in the Public Acquirer definition to include ADSs. Although the Trustee, quoting SEC, American Depositary Receipts, Securities Act Release No. 6894, Exchange Act Release No. 29226, 56 Fed. Reg. 24420 (May 30, 1991) ("SEC Release")--which uses the term "ADR" to "refer to either the physical certificate or the security evidenced by such certificate," id. at 22421 n.5--states that "[t]he SEC considers ADRs to be 'the most common form in which foreign securities trade in the United States'" (Trustee's brief on appeal at 13), the SEC Release itself does not support the proposition that a contractual reference to common stock must be presumed to encompass a reference to ADSs. The SEC Release states, inter alia, that a foreign security is owned "through" the ownership of an ADS, SEC Release at 24428, and that "an ADS is the security that represents an ownership interest in deposited securities," id. at 24421 n.5; but "[f]or purposes of the Securities Act, ADRs and deposited securities are considered separate securities," id. at 24426, and in order for ADRs to be publicly traded, "both the ADRs and the deposited securities must be registered," id. Indeed, the SEC notes that "listed ADRs are not the securities of the foreign issuer but rather of the legal entity created by the depositary," id. at 24431 (emphasis added).

For example, the owner of an ADS may not have the same voting rights as an owner of shares of the issuer, for, absent an agreement between the depositary and the issuer imposing a notification duty, see id. at 24422-23, "[t]he depositary is not obligated to notify ADR holders about any meeting of holders of the deposited securities or to distribute to ADR holders the proxy information, annual reports or other materials it receives from the issuer of the deposited securities," id. at 24429. Similarly, "[d]epositaries generally have complete discretion," when they receive non-cash distributions from the issuer, not to pass the distribution immediately to the ADS holders but instead to "retain for the benefit of ADR holders the securities or property received." Id. Thus, ADSs may represent more than merely an interest in the issuer's underlying securities. Indeed, although the Trustee contends "that market participants have a uniform understanding that ADSs are nothing more than" "a 'form' through which" a foreign issuer's shares trade on the New York Stock Exchange (Trustee's brief on appeal at 17), the SEC notes that, in light of the fact that some depositaries are established through agreement with the issuer of the deposited securities (i.e., are "sponsored") and some are established independently of the issuer (i.e., are "unsponsored"), it is possible that even with respect to a particular underlying security, the ADSs themselves might not be fungible. See SEC Release at 24431 ("In light of the sharp disagreement among ADR market participants, comment is requested regarding whether a sponsored facility and an unsponsored facility

for the same deposited security would <u>inherently result in non-fungible securities</u> . . . .").

Further the price at which an ADS is traded is not simply a function of the value of the foreign issuer's underlying security. "The ADR trading price is also a function of," <u>inter alia</u>, "foreign currency exchange rates," the risks of fluctuation in those rates, the administrative costs of establishing, maintaining, and operating the depositary, and "inefficient market dissemination of news about the issuer of the deposited securities." SEC Release at 24424. Thus, an ADS may sell "at a premium to the deposited security" or "at a discount to the deposited security." <u>Id</u>. In sum, the SEC's descriptions of ADSs reveal that ADSs are not merely common stock in a different form.

The Trustee also cites what it refers to as "the SEC's own clear recognition that '<u>Tenaris's stock trades on the New York Stock Exchange</u>'" (Trustee's brief on appeal at 18 (emphasis in brief)); but what is quoted is a complaint filed by the SEC in a lawsuit alleging that various individual investors engaged in insider trading. Industry custom and usage is not necessarily shown by a litigation position taken by a government agency for regulatory and law enforcement purposes in general, or by the SEC's position that ADSs are securities within the scope of statutory prohibitions against insider trading. And an allegation by a regulatory agency in a lawsuit does not establish what the parties meant by a particular term in their unrelated, previously negotiated contract.

The Trustee further attempts to show that custom and usage supports its interpretation of "common stock" as including ADSs by stating that

> [i]n its SEC filings, Tenaris has repeatedly acknowledged that its ordinary shares (which, as noted above, Tenaris also admits are a class of common stock, (A-1234 at ¶27)) are "traded on the NYSE." (A-1335 (2003 Form 20-F); A-1516 (2004 Form 20-F); A-614 (2005 Form 20-F).) Tenaris accordingly acknowledges that the NYSE quotes for its ADSs reflect "quoted prices for the Company's _shares_." (_Id_. (emphasis added).)

(Trustee's brief on appeal at 13.) We have several difficulties with the suggestion that Tenaris's filings constitute proof that references to common stock in the Indenture encompassed ADSs as a matter of custom and usage "so far known to the parties, that it must be supposed that their contract was made in reference to it," _Belasco Theatre Corp. v. Jelin Productions, Inc._, 270 A.D. at 206, 59 N.Y.S.2d at 46 (internal quotation marks omitted). First, Tenaris--which agreed to acquire Maverick in 2006--was not a party to the Indenture agreement, and any suggestion that Maverick, the Trustee, or the noteholders had Tenaris or its filings in mind when the Indenture contract was entered into in 2004 is unsupported and seems fanciful. Second, so-called admissions by a company in its SEC filings as to the trading and market prices of its own securities are hardly "general and not personal," _id_. Such individual statements cannot be deemed to establish an industry custom that other persons must be presumed to adopt in their contracts.

- 23 -

Further, even if an individual company's SEC filings could establish custom and usage, the sentence fragments quoted by the Trustee from the above filings of Tenaris do not establish that the Tenaris ordinary shares themselves are traded on a United States exchange or even that Tenaris so regarded them. Rather, the first page of each of the cited Tenaris reports states that

> [o]rdinary shares of Tenaris S.A. are not listed for trading but only in connection with the registration of American Depositary Shares which are evidenced by American Depositary Receipts.

(Tenaris 2003, 2004, and 2005 SEC Form 20-F reports, first page n.* (emphasis added).)

Finally, although the Trustee also argues that "common stock" in the PACC Provision should be interpreted to include ADSs because the contrary interpretation is commercially unreasonable, as "there was never any intention to exclude foreign issuers as 'Public Acquirers'" (Trustee's brief on appeal at 24; see also id. at 18, 35), this argument poses a false dichotomy between foreign and domestic companies. Foreign companies may trade their shares on a United States national stock exchange directly rather than through ADSs, and hundreds do. See, e.g., SEC Release at 24422 & n.15. Indeed, the Trustee concedes that "the Public Acquirer change of control provision includes those foreign issuers whose ordinary shares are directly traded on [a] United States exchange" (Trustee's brief on appeal at 37). Given that concession, the Trustee urges us to conclude that the parties to the Indenture did not "intend[] to distinguish between different categories of foreign issuers for the purposes of the Public Acquirer definition

- 24 -

depending solely on the decision an issuer made about" whether to list its common stock or to list ADSs, arguing that such a distinction would have served "no possible commercial purpose" (Trustee's Brief on Appeal at 38). Any suggestion that the Indenture should be read to accomplish what the Trustee views as "commercial[ly]" "reasonable" (id. at 18) essentially asks us to rewrite the Indenture's Public Acquirer definition. Instead, we are required to give effect to the intentions expressed in the agreement's own language. Given the pains taken by the parties to have the Indenture set out detailed definitions of numerous terms and to have its definition of Capital Stock make explicit reference to ADSs--a reference we are not entitled to regard as superfluous--we conclude that the district court properly declined to read ADSs into the undefined term "common stock," as used in the clause "common stock traded on a United States national securities exchange" without elaboration.

In sum, the district court did not err in dismissing the Trustee's contract claims. And as the Trustee's challenge to the dismissal of its contract claims fails, so does its challenge to the dismissal of its claim for tortious interference with contract.

CONCLUSION

We have considered all of the Trustee's arguments on this appeal and have found them to be without merit. The judgment of the district court dismissing the complaint is affirmed.

- 25 -