13-1753-cv
*Keiler et al. v. Harlequin Enterprises LTD et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2013
No. 13-1753-cv

BARBARA KEILER, MONA GAY THOMAS, AND LINDA BARRETT, ON
BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellants,*

*v.*

HARLEQUIN ENTERPRISES LIMITED, HARLEQUIN BOOKS S.A.,
HARLEQUIN ENTERPRISES B.V.,
*Defendants-Appellees.*[1]

————

Appeal from the United States District Court
for the Southern District of New York.
No. 12-cv-5558 — Harold Baer, Jr., *Judge.*

————

ARGUED: NOVEMBER 21, 2013
DECIDED: MAY 1, 2014

————

Before: KEARSE, JACOBS, AND PARKER, *Circuit Judges.*

————

---

[1] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

Appeal from a judgment of the United States District Court for the Southern District of New York (Baer, *J.*) dismissing a complaint alleging breach of publishing agreements for failure to state claims. We **AFFIRM** the dismissal of plaintiffs' first, second, and third claims. We hold that the fourth claim alleged sufficient facts to plead a breach of the publishing agreements on the theory that defendants calculated plaintiffs' e-book royalties based on an unreasonable license fee. Accordingly, we **REVERSE** the dismissal of the fourth claim and **REMAND** the case to the district court for further proceedings consistent with this Opinion.

————

DAVID B. WOLF (Michael J. Boni & John E. Sindoni, Boni & Zack LLC, Bala Cynwyd, PA, *on the brief*), DavidWolfLaw PLLC, New York, NY, *for Plaintiffs-Appellants*.

DANIEL J. LEFFELL (Jay Cohen, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Defendants-Appellees*.

JOHN R. TANDLER (F. BRITTIN CLAYTON III, *on the brief*), Ryley Carlock & Applewhite, Denver, CO, *for Amici Curiae, Romance Writers of America and The Authors Guild, supporting Plaintiffs-Appellants*.

————

BARRINGTON D. PARKER, *Circuit Judge*:

Plaintiffs-Appellants Barbara Keiler, Mona Gay Thomas, and Linda Barrett are authors of romance novels who bring putative class action claims against publishing house Defendants-Appellees Harlequin Enterprises Limited ("Harlequin Enterprises") and its

subsidiaries Harlequin Enterprises B.V. ("HEBV") and Harlequin Books S.A. ("HBSA," and together with HEBV, "Harlequin Switzerland"). Plaintiffs contend that the Harlequin entities breached agreements with them and other authors (the "Publishing Agreements") by paying them artificially low royalties on the sales of digitized versions of their books.

The United States District Court for the Southern District of New York (Baer, *J.*) concluded that plaintiffs' allegations failed to state claims and dismissed the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Keiler v. Harlequin Enters. Ltd.*, No. 12-5558, 2013 WL 1324093 (S.D.N.Y. Apr. 2, 2013). For the reasons set forth below, we hold that plaintiffs' claims based on agency, assignment, and alter ego theories cannot serve to modify the terms of the Publishing Agreements and were properly dismissed. We also conclude that the amended complaint set forth sufficient facts to plead a breach of the Publishing Agreements on the theory that defendants calculated their e-book royalties based on an unreasonable license fee. Accordingly, we affirm the judgment in part, reverse it in part, and remand for further proceedings consistent with this Opinion.

## I. BACKGROUND

This case arises in the context of a meteoric rise in e-book sales over the last several years.[2] Defendant Harlequin Enterprises is the world's largest publisher of romance novels. Prior to 1983, Harlequin Enterprises directly contracted with authors for the publication of their works under the *Harlequin (*and related) imprints using a standard agreement which Harlequin Enterprises signed as the "Publisher." (Am. Compl. ¶ 34).

---

[2] Amici note that from 2008 to 2012, e-book sales grew from $64 million annually to over $3.0 billion annually—an increase of over 4,700 percent. *Amici Curiae* Br. at 5, Dkt. No. 51.

3

Beginning in 1983, Harlequin Enterprises changed this arrangement, ostensibly "for tax and related purposes." (*Id*. ¶ 31). It registered a subsidiary HEBV, a Dutch company, in Fribourg, Switzerland. Thereafter, Harlequin Enterprises required authors to enter into publishing agreements substantially similar to its previous agreements, but with HEBV signing the agreements as the "Publisher" and with Harlequin Enterprises included in the agreements' definition of a "related licensee." (*See id.* ¶ 35). Notwithstanding this change, Harlequin Enterprises continued to draft, negotiate, and administer the publishing agreements, as well as to edit, publish, and promote the authors' novels. (*See id.* ¶¶ 3, 40, 41). HEBV, however, sent out royalty statements and payments to the authors. (*See id.* ¶¶ 41, 42). Harlequin Enterprises advised authors that the purpose of the change was to "rationalize business procedures." (*Id*. ¶ 35).

In 1994, Harlequin Enterprises registered HBSA, a Swiss company, as the successor of HEBV, again "for tax and related purposes." (*See* Am. Compl. ¶ 31). Thereafter, HBSA signed the agreements as the "Publisher" and Harlequin Enterprises continued to be defined in the Publishing Agreements as a "related licensee." Harlequin Enterprises continued to publish, and promote the authors' novels while HBSA sent out royalty statements and payments. (*Id.*¶ 36). Harlequin Enterprises advised authors that the change to having HBSA sign as the "Publisher" was a name change that "would not affect" them. (*Id.*).

Under the terms of the Publishing Agreements, the authors granted to the "Publisher" on a "sole and exclusive basis all the rights in and to [their Works] in any country throughout the world under various imprints and trade names during the full term of copyright." (*Id.* ¶ 49 (brackets in original)). The Publishing Agreements additionally provided that HEBV or HBSA as the

4

Publisher had "the sole and exclusive right to execute, sell, license or sublicense . . . rights subject to the sharing of net proceeds." (*Id*.). The Publishing Agreements also detailed how authors were to be compensated in connection with the sales of various editions of their works. Specifically, author royalties on U.S. sales of mass market paperback and hardcover copies were based on a percentage of the cover price.

Moreover, the Publishing Agreements contained two umbrella clauses covering the potential sale, license, or distribution of the authors' works in other media. Under the "All Other Rights" clause, the Publishing Agreements provided that the authors' royalties would be calculated as follows:

> On all other rights exercised by Publisher or its Related Licensees fifty percent (50%) of the Net Amount Received by Publisher for the license or sale of said rights. The Net Amount Received for the exercise, sale or license of said rights by Publisher from a Related Licensee shall, in Publisher's estimate, be equivalent to the amount reasonably obtainable by Publisher from an Unrelated Licensee for the license or sale of the said rights.

(*Id*. ¶ 52). The Other Rights clause provided:

> If Publisher licenses, sublicenses or sells to an Unrelated Licensee any of the following rights to the Work anywhere in the world, in any language, Author's and Publisher's share of net amount received by Publisher for said license, sublicense or sale shall be apportioned as follows . . .

> [Author's share] 50% [Publisher's Share] 50%.

(Am. Compl. ¶ 53 (brackets in original)). In addition, the Publishing Agreements provided that the Publisher could "assign this Agreement to any related legal entity," and could "delegate any of its editorial, administrative and/or other responsibilities pursuant to this Agreement to its parent company or to an affiliate, subsidiary or other related legal entity." (*Id*.¶ 49). Consistent with this provision, Harlequin Enterprises performed many of the responsibilities of the Publisher under the agreements. (*See, e.g.*, *id*.¶¶ 3, 39, 41-48).

As the market for e-books expanded, Harlequin Enterprises sold and licensed e-books and e-book rights directly to consumers on its website and to e-book licensees such as Amazon. (*Id*. ¶ 55). In 2011, Harlequin Enterprises informed authors that it believed that author royalties for e-books were covered by the All Other Rights clause in the Publishing Agreements and accordingly advised the authors that their royalty payments would be calculated based on the net amount received by Harlequin Switzerland from a license to publish e-books that Harlequin Switzerland purportedly granted to Harlequin Enterprises. Harlequin Enterprises claimed that the net amount received by Harlequin Switzerland was 6 percent to 8 percent of the cover price of the e-books, and that, consequently, the royalties owed to the authors were 50 percent of that amount, or 3 percent to 4 percent of the cover price of the e-books. (*Id*. ¶ 56).

Plaintiffs commenced this putative class action seeking to represent authors who entered into Publishing Agreements with Harlequin Switzerland between 1990 and 2004. In their amended complaint, plaintiffs asserted three claims for breach of contract grounded in agency, assignment, and alter ego liability. The common contention was that, under the Publishing Agreements, Harlequin Enterprises rather than Harlequin Switzerland should be recognized as the "Publisher" when calculating royalty payments. (*Id*. ¶ 11). Under this reading, plaintiffs contended they are entitled

to 50 percent of the amount received on e-books by Harlequin Enterprises (which is upwards of 50 percent of the cover price), rather than the far lower 50 percent of the "Net Amount Received" by Harlequin Switzerland. (Am. Compl. ¶¶ 6, 55).

In addition, the amended complaint asserted a claim for breach of contract on the theory that the license fees paid to Harlequin Switzerland did not comply with the"All Other Rights" clause requiring that the net amount received from a related licensee be equivalent to the "amount reasonably obtainable" from an unrelated licensee. Finally, the amended complaint asserted a claim for unjust enrichment against Harlequin Enterprises.

Defendants moved under Rule 12(b)(6) to dismiss the amended complaint and the district court granted the motion. The court held that the first three claims failed because the contractual definition of "Publisher" under the Publishing Agreements was binding, and therefore, plaintiffs' theories of agency, assignment, and alter ego could not recast the obligations in the contracts. *Harlequin*, 2013 WL 1324093, at *2. The court dismissed the fourth claim on the ground that the amended complaint failed to allege sufficient facts supporting plaintiffs' assertion that the licensing fees Harlequin Enterprises paid to its subsidiaries were not equivalent to "the amount reasonably obtainable from an Unrelated Licensee." *Id*. at *3. Finally, the district court held that plaintiffs' contention that they were entitled to a larger share of e-book royalties fell within the scope of a written contract (the Publishing Agreement) and therefore precluded an unjust enrichment claim. *Id*. The district court entered judgment in favor of the defendants and this appeal followed.

## II. DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient facts which, taken as true, state a

plausible claim for relief.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).  We review *de novo* the dismissal of a complaint under Rule 12(b)(6), accepting all factual allegations (but not legal conclusions) as true and drawing all reasonable inferences in favor of the plaintiffs.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *N. J. Carpenters Health Fund v. Royal Bank of Scotland Grp.*, PLC, 709 F.3d 109, 119 (2d Cir. 2013).

Plaintiffs contend that the district court erred in dismissing their breach claims because, under principles of agency, assignment, and alter ego, their amended complaint plausibly alleged that Harlequin Enterprises was the "Publisher."  They also contend that they plausibly alleged that the intra-company licensing fees were not "equivalent to the amount reasonably obtainable" from an unrelated licensee.[3]  We consider these matters in turn.

Under New York law, which governs the Publishing Agreements, the best evidence of what parties to a written agreement intend is what they say in their writing.  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).  Consequently, a written agreement that is complete, clear, and unambiguous must be enforced according to its terms.  *Id*.

A contract is unambiguous when the contractual language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion.  *Law Debenture Trust Co. of N. Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010).  By contrast, ambiguity exists where a contract's term could objectively suggest more than one meaning to one familiar with the customs and terminology of the particular trade or business**.**  *See id*. at 466; *Fox Film Corp. v. Springer*, 273 N.Y. 434, 436 (1937)**.**  Whether a contract is

---

[3]  In their briefs, plaintiffs also challenged the district court's dismissal of their unjust enrichment claim.  At oral argument, plaintiffs withdrew this claim.

ambiguous is a question of law. *See Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007); *Greenfield*, 98 N.Y.2d at 569.

Based on our review of the Publishing Agreements, we conclude that plaintiffs' first through third claims are not viable because the Publishing Agreements unambiguously provide that HEBV or HBSA is the "Publisher" and Harlequin Enterprises is a "Related Licensee" for purposes of computing royalty payments. The fact that Harlequin Switzerland may have delegated certain publishing and administrative duties to Harlequin Enterprises does not modify this relationship. The Publishing Agreements expressly contemplate that the "Publisher" could assign or delegate publishing duties "to any related legal entity," including "to its parent company or to an affiliate [or] subsidiary." (*See* Am. Compl. ¶ 49). These provisions are unambiguous and enforceable.

Plaintiffs contend that they have set forth sufficient facts regarding the parties' course of dealing tending to show that Harlequin Enterprises was actually the Publisher. But New York law is well settled that a written agreement that is complete and unambiguous is to be interpreted without the aid of extrinsic evidence and that industry practice may not be used to vary the terms of such a contract. *See Law Debenture Trust Co. of N. Y.*, 595 F.3d at 467-48; *Croce v. Kurnit*, 737 F. 2d 229, 238 (2d Cir. 1984).

Plaintiffs rely on *Nolan v. Sam Fox Pub. Co., Inc.*, 499 F.2d 1394 (2d Cir. 1974) for the proposition that, in keeping with the course of dealings between the parties, this Court could supplant the definition of Publisher in the Publishing Agreements. This reliance, however, is misplaced. In *Nolan*, the district court interpreted the word "Publisher" to cover its assignee where the named publisher in the agreement at issue had been dissolved. *See Nolan v. Williamson Music, Inc.*, 300 F. Supp. 1311, 1319 (S.D.N.Y. 1969). Accepting the

defendant's interpretation of the contract, the court reasoned, would have meant that only the dissolved publishing company would have been liable for the payment of royalties due to the plaintiff. *Id*. To avoid this impossible situation, the district court elected to define "Publisher" with reference to another provision of the contract which referred to the duties of the "Publisher, its successors and assigns." *Id*. In affirming, we observed: "Our construction of the contract [did] not reform the agreement in any way, but [wa]s more likely in keeping with the intentions of the parties." *Nolan*, 499 F.2d at 1399.

Here, however, the Publishing Agreements explicitly provide for the allocation of royalty payments between the Publisher (Harlequin Switzerland) and the authors where the Publisher engages the services of a related licensee such as Harlequin Enterprises. Substituting Harlequin Enterprises as the Publisher, as urged by the plaintiffs, would, in effect, require redrafting significant provisions of the contract while ignoring other express ones.

Moreover, as the district court observed, plaintiffs' theories of agency, assignment, and alter ego are not, strictly speaking, theories of contract interpretation, but rather theories of vicarious liability. Such theories, however, cannot displace the express terms of the Publishing Agreement. Consequently, we hold that the first three claims were properly dismissed.

The fourth claim alleged that defendants breached the Publishing Agreements because the licensing fees Harlequin Enterprises paid to Harlequin Switzerland—the figure on which plaintiffs' royalties were based—were not "equivalent to the amount reasonably obtainable . . . from an Unrelated Licensee." The district

court dismissed this claim on the ground that the factual allegations supporting it were insufficient. We disagree.

As we have previously observed, Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 323 (2d Cir. 2011); *see also Twombly*, 550 U.S. at 555. Consequently, to survive a motion under Rule 12(b)(6), a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level. *See Ideal Steel Supply Corp.*, 652 F.3d at 323-24.

The amended complaint identified the specific contractual provision at issue, (Am. Compl. ¶ 81), and alleged how defendants breached that provision: "[t]he claimed "license" from Harlequin Switzerland to Harlequin Enterprises, in the amount of 6% to 8% of the cover price of the works, is not "equivalent to the amount reasonably obtainable by Publisher from an Unrelated Licensee for the license or sale of the said rights." (*Id*. ¶ 82). Further, the amended complaint alleged that "[t]he amount reasonably obtainable by a publisher from an unrelated licensee for the license or sale of the said rights is, upon information and belief, much higher than 6% to 8% of cover price and is at least 50% of net receipts." (*Id*. ¶ 83).

The amended complaint provided context for these allegations, contending that after Harlequin Enterprises set up its subsidiaries, ostensibly for tax purposes, it continued to control the publication, marketing, and distribution of plaintiffs' works. (*See id*. ¶¶ 31, 35-36, 38-41, 45, 47, 48). Moreover, the amended complaint went on to allege that these actions substantially lowered the

plaintiffs' royalties, despite Harlequin Enterprises' assurances that its inter-affiliate licensing arrangements would not affect their rights. (*See id*. ¶¶ 7-8, 35-36). These allegations, that the amount of royalties they received were not equivalent to the amount reasonably obtainable from an unrelated licensee, nudged plaintiffs' claims across the line from conceivable to plausible. *See Twombly*, 550 U.S. at 570.

The defendants' reliance on *Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC*, 414 F. App'x 334, 336 (2d Cir. 2011) is not to the contrary. That case involved a predatory pricing claim, where price information is more critical. Consequently, we found the price allegations to be conclusory where "[plaintiff] provide[d] no facts to support its contention that $170 is actually close to the standard industry cost." *Id*. Here, however, plaintiffs have provided a basis, albeit "upon information and belief," that defendants engaged in self-dealing because the industry standard is considerably higher than the 6 to 8 percent of net receipts that Harlequin Enterprises remits to its subsidiary Harlequin Switzerland (i.e. at least 50 percent of net receipts). We have observed in the past that pleading on the basis of information and belief may be appropriate under such circumstances. *See Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (noting the *Twombly* plausibility standard does not prevent a plaintiff from pleading facts "upon information and belief" where the facts are peculiarly within the control of the defendant); *see also Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008).

We reach this conclusion in a context where discovery had apparently begun to adduce additional information supportive of plaintiffs' claim.[4] In *Ideal*, we reasoned that *Twombly* would not

---

[4] In their opposition to defendants' motion to dismiss, plaintiffs cited a survey of royalty rates paid by romance publishers. *Harlequin*, 12 Civ. 5558, Dkt. 22, at 23 (S.D.N.Y.). At the motion hearing, plaintiffs also purported to have discovered a sublicense agreement

require that a complaint be dismissed if evidence had already been produced during discovery that would fill the perceived gaps in the complaint because pleadings may be amended. 652 F.3d at 324-25. We underscore that *Twombly* does not impose a probability requirement at the pleading stage. *See Arista Records LLC*, 604 F.3d at 120 (citing *Twombly*, 550 U.S. at 556). It simply requires factual allegations sufficient to raise a reasonable expectation that discovery is likely to generate evidence of liability. *See id.* For these reasons, we conclude that the fourth claim should not have been dismissed.

## III. CONCLUSION

For all the foregoing reasons, we **AFFIRM** the district court's dismissal of the first, second, and third claims. We **REVERSE** the dismissal of the fourth claim, and we **REMAND** the case to the district court for further proceedings consistent with this Opinion.

---

between Harlequin Enterprises and another subsidiary, Harlequin Digital Sales Corporation, that showed a license rate of 40 percent of the cover price, significantly higher than the 6 to 8 percent license fee purportedly paid to Harlequin Switzerland. Joint App'x at 162.