**IN RE: OLD CARCO LLC,**
**(f/k/a Chrysler LLC),**
**et al., Debtors.**

**TRW Automotive US, LLC, and TRW Automotive Holdings Corp., Plaintiffs,**

**v.**

**Old Carco Liquidation Trust and Rhonda Masquat, Defendants.**

**Case No. 09–50002 (SMB) (Jointly Administered)**
**Adv. Proc. No. 14–02055 (SMB)**

United States Bankruptcy Court, S.D. New York.

Signed April 13, 2015

Entered April 14, 2015

KLESTADT & WINTERS, LLP, 570 Seventh Avenue, 17th Fl., New York, N.Y. 10018, Sean C. Southard, Esq., Maeghan J. McLoughlin, Esq., and BROOKS WILKNS SHARKEY & TURCO, PLLC, 401 S. Old Woodward, Suite 400, Birmingham, MI 48009, Herbert C. Donovan, Esq., Michael R. Turco, Esq., Attorneys for Plaintiffs

OLSHAN FROME WOLOSKY LLP, Park Avenue Tower, 65 East 55th Street, New York, N.Y. 10022, Michael S. Fox, Esq., Jordanna L. Nadritch, Esq., Matteo J. Rosselli, Esq., Attorneys for Defendant Rhonda Masquat

JONES DAY, 222 East 41st Street, New York, N.Y. 10017, Corrine Ball, Esq., Jeffrey B. Ellman, Esq., Brett J. Berlin, Esq., Attorneys for Defendant Old Carco Liquidation Trust

## MEMORANDUM DECISION GRANTING SUMMARY JUDGMENT TO PLAINTIFF

STUART M. BERNSTEIN, United States Bankruptcy Judge:

TRW Automotive US, LLC and TRW Automotive Holdings Corp. (collectively, "TRW") initiated this adversary proceeding against Old Carco Liquidation Trust (the "Liquidation Trust") seeking a declaration that rights purportedly assigned by the Liquidation Trust to the defendant, Rhonda Masquat, the class representative in an Oklahoma class action, had already been extinguished by prior agreement or assigned to New Chrysler, the purchaser of substantially all of the debtors' assets. Masquat moved to intervene and to dismiss the adversary proceeding pursuant to FED. R. CIV. P. 12(b)(6), made applicable to this proceeding by FED. R. BANKR. P. 7012(b). Upon notice to the parties, the Court converted the motion to one for summary judgment, and for the following reasons, grants summary judgment to TRW.

## BACKGROUND

The underlying facts are not in dispute. From 1993 to 2001, Old Carco LLC f/k/a Chrysler LLC ("Old Chrysler") manufactured and sold certain motor vehicles known as the "LH platform vehicles" that

incorporated steering components manufactured by TRW. The components were supplied subject to the general terms and conditions provided in several purchase agreements with Old Chrysler, which the *Complaint* refers to as the "Supply Agreements."[1] The Supply Agreements required TRW to maintain a comprehensive general liability insurance policy and to name Old Chrysler as an additional insured under the policy. (*Motion to Dismiss*, Ex. 2 at ¶ 11(a); Ex. 3 at ¶ 11(a).) The Supply Agreements also required TRW to indemnify and hold Old Chrysler harmless against "all claims, liabilities, losses, damages, and settlement expenses in connection with any breach by Seller [TRW] of these general conditions or for injury or death of any person and damage or loss of any property" resulting from TRW's "act, omission or negligent work" in fulfilling the orders. (*Id.*, Ex. 2 at ¶ 11(b); Ex. 3 at ¶ 11(b).)

In 2005, Rhonda Masquat initiated a class action against Old Chrysler in Oklahoma state court (the "Oklahoma Litigation") for breach of express and implied warranties ("Class Claims"), alleging that the LH platform vehicles were equipped with defective power rack and pinion steering systems. (*Complaint* at ¶¶ 4–5.)[2]

Old Chrysler and affiliated entities[3] filed chapter 11 petitions in this Court on April 30, 2009 (the "Petition Date"), automatically staying the Oklahoma Litigation.

## A. The Sale of Old Chrysler's Assets

Prior to the commencement of the bankruptcy cases, Old Chrysler entered into an agreement with Fiat S.p.A. and New Carco Acquisition LLC (collectively, "New Chrysler") to sell substantially all of Old Chrysler's operating assets free and clear of liens, claims and interests to New Chrysler in exchange for the assumption of certain liabilities and the payment of $2 billion in cash.[4] By then, Old Chrysler owed secured debt aggregating more than $13 billion, (*Sale Motion* at ¶¶ 13–15), and additional trade debt of approximately $5.34 billion. (*Id.* at ¶ 16.) Shortly after the commencement of the chapter 11 case, Old Chrysler filed the *Sale Motion* to approve the transaction. Among other things, the motion sought to establish procedures for competitive bidding (the "Bidding Procedures") and the assumption and assignment of executory contracts and unexpired leases (the "Contract Procedures") in conjunction with the sale. The Court approved the Contract Procedures

---

1. Copies of the Supply Agreements from 1994 and 2000 are attached as Exhibits 2 and 3 to *Rhonda Masquat's Motion to Dismiss Plaintiffs' Adversary Complaint*, dated Sept. 16, 2014 ("Motion to Dismiss"). (ECF Doc. # 16). "ECF Doc. #___" refers to the docket in this adversary proceeding, and "ECF/Main Case Doc. #___" refers to the docket in the bankruptcy case.

2. A copy of Masquat's *First Amended Petition*, dated June 28, 2005, is attached as Exhibit A to the *Complaint*.

3. Old Chrysler and related debtor entities will be collectively referred to as "Old Chrysler."

4. *Motion of Debtors and Debtors in Possession, Pursuant to Sections 105, 363 and 365 of the*

*Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, for (I) an Order (A) Approving Bidding Procedures and Bidder Protections for the Sale of Substantially All of the Debtors' Assets and (B) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice Thereof; and (II) and Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets, Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and Related Procedures, and (C) Granting Certain Related Relief*, dated May 3, 2009 ("*Sale Motion*"), at ¶ 41 (ECF/Main Case Doc. # 190.)

**46**

along with Bidding Procedures by order dated May 7, 2009.[5]

To the extent pertinent to the pending motions, the *Bidding Procedures Order* required Old Chrysler to identify the executory contracts and unexpired leases it intended to assume and assign (the "Designated Agreements") and provide notice to the counterparties. (*Id.* at ¶ 19(a)–(c).) The Designated Agreements were among the "Purchased Assets." (*See* Master Transaction Agreement, dated as of Apr. 30, 2009 (the "Purchase Agreement"), at § 2.06(a) (identifying "Assumed Contracts" as Purchased Assets).)[6]

The Purchased Assets also included "the claims and causes of action listed on Section 2.06(q) of the Company Disclosure Letter." (Purchase Agreement at § 2.06(q).) Section 2.06(q) of the Company Disclosure Letter identified for assignment all claims and causes of action "arising under or related to an Assumed Contract" or "subject to Section 2.07(i) of the Master Transaction Agreement, against any party to an Assumed Contract that is a supplier ... with whom the Purchaser and/or its subsidiaries expects to have an ongoing commercial relationship. ..." (*Article II Company Disclosure Letter to Master Transaction*

*Agreement,* as amended May 31, 2009).)[7] Under section 2.06(j) of the Purchase Agreement, the Purchased Assets included "all defenses, counterclaims, rights of recovery, rights of setoff and rights of recoupment, in each case only to the extent primarily related to the Purchased Assets or the Assumed Liabilities," and section 2.07(i) excluded "all of Sellers' defenses, counterclaims, rights of recovery, rights of setoff and rights of recoupment that are not described in Section 2.06(j)." The net effect of these provisions was that New Chrysler purchased all claims, including defenses, counterclaims, rights of recovery and rights of setoff and recoupment related to the Assumed Contracts with a supplier like TRW and Old Chrysler retained all other defenses, counterclaims, rights of recovery, rights of setoff and rights of recoupment.

On May 15, 2009, Old Chrysler filed an Assignment Notice designating certain supplier agreements,[8] including its contracts with TRW. (*See Assignment Notice,* Annex B, at 36.) The Addendum to the *Assignment Notice* stated that Old Chrysler was designating all agreements with the supplier unless stated otherwise, including "all contracts, purchase orders or similar agreements providing for the sale or provision of goods or services to the

**5.** *See Order Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Provide Certain Bid Protections, (C) Scheduling a Final Hearing Approving the Sale of Substantially All of the Debtors' Assets and (D) Approving the Form and Manner of Notice Thereof,* dated May 7, 2009 ("Bidding Procedures Order") (ECF/Main Case Doc. # 492).

**6.** A fully executed copy of the Purchase Agreement is attached as an exhibit to the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens,*

*Claims, Interests and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and Related Procedures and (III) Granting Related Relief,* dated June 1, 2009 ("*Sale Order*") (ECF/Main Case Doc. # 3232).

**7.** The *Article II Company Disclosure Letter* is attached as Annex A to the Purchase Agreement.

**8.** *Notice of Filing of Schedule of Certain Designated Production Supplier Agreements and Cure Costs Related Thereto,* dated May 15, 2009 ("Assignment Notice"), Annex B (ECF Doc. # 848).

Debtors, and all related modifications, amendments, supplements, addenda and restatements thereof, related memoranda of understanding, ancillary agreements thereto and any and all similar agreements." The Contract Procedures required the non-debtor party to object in writing. (*Bidding Procedures Order* at ¶ 19(g).) Objecting counterparties were obligated to meet and confer in good faith with Old Chrysler and New Chrysler, (*id.*), and unresolved objections would be considered by the Court at an omnibus hearing on objections to assumption and assignment. (*Id.* at ¶ 19(h).) Designated Agreements were deemed assumed and assigned upon resolution of an objection either by agreement of the parties or by order of the Court approving an assumption and assignment. (*Id.* at ¶ 19(j).) Subject to satisfaction of the conditions relating to resolution of cure or assignment disputes in ¶ 19(j), Old Chrysler was deemed to have assumed and assigned the Designated Agreement as of the date of and effective only upon the closing date of the sale. (*Id.* at ¶ 19(k).)

Following a three-day sale hearing, the Court granted the *Sale Motion, In re Chrysler,* 405 B.R. 84, 113 (Bankr.S.D.N.Y. 2009), and entered the *Sale Order.* Among other things, the *Sale Order* authorized and directed the transfer of all Purchased Assets, (*id.* at ¶ 9), and approved the assumption and assignment of the Designated Agreements, which it referred to as the "Assumed Agreements," to New Chrysler, subject, however, to the Contract Procedures, "including the resolution of any Section 365 Objection...." (*Id.* at ¶ 25.) The *Sale Order* also provid-

ed for the retention of jurisdiction by the Court to "interpret, implement and enforce the terms and provisions" of the order and the Purchase Agreement. (*Id.* at ¶¶ 43, 59.) The sale closed on June 10, 2009.

## B. The *Cure Agreement*

TRW filed an objection to the *Assignment Notice.*[9] The latter had listed the cure amount as $27,213,759.39. (*Assignment Notice,* Annex B, at 36.) TRW did not object to the assumption and assignment but objected primarily to the proposed cure. It stated that the *Assignment Notice* did not identify the orders and contracts being assumed and assigned—although Old Chrysler had subsequently informed TRW that it intended to assume and assign all of the contracts with TRW—or how the cure was calculated. (*TRW Objection* at ¶¶ 1–2.) TRW contended that the cure amount was higher. (*Id.* at ¶ 4.)

TRW stated that the business people were working on a "reconciliation" that had not been completed, (*id.* at ¶ 1), and understood that "the Cure Costs proposed in the TRW Notice would be reduced by amounts for certain disputed debits or claims to which TRW objects." (*Id.* at ¶ 2.) It sought confirmation that once the reconciliation was completed, it would have no further liability on account of any pre-closing claims:

> To the extent Debtors are permitted to reduce the Cure Amount by the prepetition claims asserted by the Debtors against TRW, TRW seeks confirmation that upon such payment, TRW shall not have any liability to Debtors or Purchaser for any such claims arising under or

9. *Limited Objection of TRW Automotive U.S. LLC to the Debtors Motion Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 for an Order Authorizing the Assumption and Assignment Of Certain Executory Contracts and Unexpired Leases and the Notice of Filing of Schedule of Certain Designated Supplier Agreements and Cure Costs Related Thereto,* dated May 26, 2009 ("*TRW Objection*") (ECF/Main Case Doc. # 2214).

in connection with the Agreements prior to Closing. (*Id.* at ¶ 2 n.3.)

On June 18, 2009, after the closing date of the sale but while TRW, Old Chrysler and New Chrysler were still negotiating, New Chrysler filed a notice confirming numerous Designated Agreements.[10] New Chrysler listed the TRW contracts and a cure amount of $29,063,270. (*June 18 Notice*, Ex. A.) The Designated Agreements specifically excluded five TRW-related purchase orders, Nos. 03264042, 04243267, 07526033, 08552026 and 08552027. (*Id.*, Ex. A.) The Addendum to the *June 18 Notice* contained the same language as the Addendum to the *Assignment Notice*. Thus, except for the five excluded purchased orders, Old Chrysler was assuming and assigning to New Chrysler "all of the agreements ... relating to the supply of goods and services to the Debtors."

On June 26, 2009, the three parties executed a letter agreement modifying the terms and conditions of the Designated Agreements with TRW on a going forward basis. (*Letter from Ronald E. Kolka and Douglas J. Doran to John Plant,* dated June 26, 2009 (the "*Cure Agreement*").)[11] The *Cure Agreement* confirmed that Old Chrysler had assumed and assigned to New Chrysler the "purchase orders and all clauses that are governed by the Debtors' current terms and conditions and any other signed agreements ... to which TRW Automotive Inc. or any of its Affiliates and any Debtor are a party (any such contract or lease designated by the Debtors, an 'Agreement')" as of June 10, 2009. (*Cure*

*Agreement* at 1.) Paragraph 5 of the Cure Agreement, which is critical to the parties' dispute, confirmed that with one exception, the parties' agreement satisfied all of the pre-closing claims between them:

> 5. The full payment of the Undisputed Cure Amount in accordance with the terms of the Bidding Procedures Order and this letter agreement, and ... the full payment of Disputed Cure Amounts that become Undisputed Cure Amounts, *shall constitute full and complete satisfaction of all claims the Debtors and TRW may have against each other, arising under or in connection with the Agreement(s) prior to the closing of the Sale Transaction (the "Closing"), except for unknown claims against TRW under the Agreements in the following categories: warranty, product liability, recall or campaign indemnification, and intellectual property infringement indemnification.* Except as set for in this paragraph, upon such payment, neither the Debtors nor the Purchaser on the one hand, nor TRW on the other hand, shall have any liability for any claim arising under or in connection with Agreement(s) prior to the Closing.

(*Id.* at 3 (emphasis added).)

## C. Masquat Moves for Stay Relief

Meanwhile, Masquat's class action lay dormant. On November 19, 2009, she moved for relief from stay to continue prosecuting the Oklahoma Litigation. (*Motion of Rhonda Masquat for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362,* dated Nov. 19, 2009, at ¶ 1

---

10. *Notice of (I) Assumption by Debtors and Assignment to Purchaser of Certain Executory Contracts and Unexpired Leases and (II) Cure Costs Related Thereto,* dated June 18, 2009 ("*June 18 Notice*") (ECF/Main Case Doc. # 4089). A copy of the *June 18 Notice* is also attached as Exhibit C to the *Complaint.*

11. A copy of the *Cure Agreement* is attached as Exhibit C to *Plaintiff's Response in Opposition to Motion to Dismiss,* dated Oct. 24, 2014 ("*TRW Response*") (ECF Doc. # 29).

(ECF/Main Case Doc. # 5989).) The motion was resolved through a stipulation and agreed order. Old Chrysler consented to relief from the stay for the limited purpose of allowing Masquat to pursue the proceeds of any insurance policy procured by a manufacturer, who was not identified in the motion, that named Old Chrysler as an additional insured and covered the claims asserted in the Oklahoma Litigation. (*Stipulation and Agreed Order Granting Rhonda Masquat, as Class Representative, Limited Relief from the Automatic Stay,* dated Jan. 6, 2010 ("*Stipulation*"), at ¶ 2 (ECF/Main Case Doc. # 6166).) In return, Masquat agreed to waive any right to file a proof of claim in the bankruptcy case on the basis of the claims asserted in the Oklahoma Litigation. (*Id.* at ¶ 3.)

### D. Confirmation of the *Plan* and Creation of the Liquidation Trust

The Court confirmed Old Chrysler's *Second Amended Joint Plan of Liquidation* ("*Plan*") on April 23, 2010.[12] Among other things, the *Confirmation Order* authorized Old Chrysler to enter into the "Liquidation Trust Agreement,"[13] and transferred to and vested in the Liquidation Trust all of the property of the estate. (*Id.* at ¶ 23; *accord Plan* at Art. IV(A)(1), (D).) Transferred property included Old Chrysler's causes of action and rights and benefits under any "Postpetition Agreement," (*Plan* at Art. IV(E)), which was defined as any valid contract or agreement entered into by Old Chrysler on or after the Petition Date. (*Plan* at Art. X(A)(171).) The Trust was authorized to collect, administer, and liquidate transferred property, make distributions to allowed claims, and resolve disputed claims and causes of action. (*Plan* at Art. IV(B)(3)(a).)

The *Confirmation Order* also provided that the Court would retain jurisdiction over the matters set forth in Article VIII of the *Plan.* Article VIII of the *Plan* provided that the Court retained jurisdiction after the effective date to:

3. Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

4. Hear and determine any disputes relating to Postpetition Agreements assigned to the Liquidation Trust pursuant to Section IV.E, including any disputes relating to the Purchase Agreement;

. . .

6. Decide or resolve any motions, applications, adversary proceedings, contested or litigated matters and any other matters pending before the Bankruptcy Court . . . and either grant or deny any motions or applications involving any Debtor, the Liquidation Trust, the Liquidation Trustee or the Litigation Manager that may be pending on the Effective Date or brought thereafter;

. . .

14. Resolve any matter relating to the sale, liquidation, abandonment or

---

12. *Order Confirming Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified,* dated Apr. 23, 2010 ("*Confirmation Order*") (ECF/Main Case Doc. # 6875).) A copy of the *Plan* is attached as Annex I to the *Confirmation Order.*

13. A copy of the Form of Liquidation Trust Agreement is attached as Annex B–1 to the *Notice of Filing of Plan Exhibit X.A.93C and Revised Plan Exhibits X.A.142, X.A.143 and X.A.189.* (ECF/Main Case Doc. # 6787).

other disposition of any Liquidation Trust Assets....

(*Plan* at Art. VIII(A).)

The *Plan* went effective on April 30, 2010. (*Notice of (A) Entry of Order Confirming Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified and (B) Occurrence of Effective Date*, dated May 1, 2010, at ¶ 2 (ECF/Main Case Doc. # 6980).)

## E. The *TRW Decision*

Having apparently determined that TRW failed to procure insurance coverage for Old Chrysler and that TRW's policies did not cover the Class Claims, Masquat filed an action against TRW in the United States District Court for the Western District of Oklahoma seeking a declaration that TRW was obligated to indemnify Old Chrysler under the Supply Agreements for any judgment in the Oklahoma Litigation ("Indemnification Claim"). The District Court dismissed the action, ruling that under Michigan law, which governed the Supply Agreements, a right to indemnity does not accrue until the underlying liability of the indemnitee becomes fixed. Since Old Chrysler's liability had not yet been determined, Masquat's Indemnification Claim was premature.

Following the District Court's ruling, Masquat returned to state court and moved for summary judgment against Old Chrysler in the Oklahoma Litigation. The Oklahoma state court granted the motion on October 2, 2013. (*Order Granting Plaintiff's Motion for Summary Judgment*, dated Oct. 2, 2013, at 16.) [14] Before the state court rendered its decision, TRW filed a motion in this Court seeking to enjoin Masquat from proceeding to judgment and a declaration that any judgment

in the Oklahoma Litigation would be void for any purpose other than as a prerequisite to recovery against an insurance policy. (Motion to Enforce and Prevent Further Violation of Prior Order, dated Aug. 9, 2013 (ECF/Main Case Doc. # 8201).) TRW asserted that Masquat's use of a judgment to pursue the Indemnification Claim against TRW violated the express terms of the Stipulation, which created a carve-out from the injunction imposed by the Confirmation Order.

TRW's motion omitted one critical piece of information. For reasons it has never explained, it did not inform the Court, and possibly Masquat, of the *Cure Agreement*, or its position asserted in this adversary proceeding that Old Chrysler, by a combination of the *Sale Order* and *Cure Agreement*, had released or assigned the Indemnification Claim to New Chrysler.

In a memorandum decision dated November 8, 2013, the Court denied the motion, holding that TRW was not a party or a third-party beneficiary to the *Stipulation* and was not protected by the terms of the *Confirmation Order*. Therefore, TRW lacked prudential standing to enforce either the *Stipulation* or the *Confirmation Order*. *In re Old Carco LLC*, 500 B.R. 683, 691–92 (Bankr.S.D.N.Y.2013) ("*TRW Decision*"). The Court also ruled that the motion failed on the merits, explaining that the *Stipulation* and the injunction provisions in the *Confirmation Order* did not affect Masquat's right to proceed against a third party. Unaware of the *Cure Agreement* and the issues that it raised, the Court noted that the Indemnification Claim vested solely in the Liquidation Trust, and concluded that Masquat could only assert claims against TRW based on

---

14. A copy of the state court's decision is attached as Exhibit 1 to the *Masquat Motion to Dismiss*.

its direct liability to the class in the Oklahoma Litigation. *Id.* at 693.

### F. The Adversary Proceeding

Following the *TRW Decision*, the Liquidation Trust assigned all of its claims, if any, against TRW arising from the Supply Agreements to Masquat ("TRW Claims").[15] (*Assignment of Claim*, dated June 4, 2014.)[16] Having obtained a judgment against Old Chrysler, Masquat reasserted the Indemnification Claim against TRW in the United States District Court for the Western District of Oklahoma. In response, TRW commenced this adversary proceeding against the Liquidation Trust, seeking once again to head off the parallel proceeding in Oklahoma.

The *Complaint* includes two counts seeking alternative declaratory relief. Count One requests a declaratory judgment that the TRW Claims, including the Indemnification Claim, were extinguished by the *Cure Agreement*. (*Complaint* at ¶ 38.) Count Two seeks a declaration that even if the TRW Claims were among the "unknown" claims excluded from the release in paragraph 5 of the *Cure Agreement* (the "Excepted Claims"), the Excepted Claims were assigned to New Chrysler. (*Id.* at ¶ 45.)

Masquat successfully moved to intervene, (*Order Granting Rhonda Masquat's Motion to Intervene Pursuant to Rule 7024 of the Federal Rules of Bankruptcy Procedure*, dated Nov. 17, 2014 (ECF Doc. # 39)), and filed the *Motion to Dismiss*. Relying on Michigan law, she contended that the Indemnification Claim was an Excepted Claim under the *Cure Agreement* because it had not accrued at the time of execution, and was, therefore, an "unknown" claim as a matter of law. (*Motion to Dismiss* at ¶¶ 19–20.) Masquat also argued that the Court had expressly ruled in the *TRW Decision* that Old Chrysler retained the Indemnification Claim. (*Id.* at ¶ 25.) Finally, Masquat contended that the Bankruptcy Court was "not the proper forum" to adjudicate the dispute and argued that the Court should "reject TRW's request to relocate the venue of this dispute" by dismissing the proceeding. (*Id.* at ¶ 35.)

In response, TRW argued that the Indemnification Claim was not an Excepted Claim because it was not "unknown" at the time of the *Cure Agreement*. (*Plaintiff's Response in Opposition to Motion to Dismiss*, dated Oct. 24, 2014 ("*TRW Response*"), at ¶ 30 (ECF Doc. # 29).) TRW also argued that the Excepted Claims were assigned together with the Supply Agreements to New Chrysler and nothing in the *Cure Agreement* stated otherwise. (*Id.* at ¶¶ 1920.) With respect to Masquat's reliance on the *TRW Decision*, TRW argued that the Court was unaware of the *Cure Agreement* and did not consider the assumption and assignment of the Supply Agreements. (*Id.* at ¶ 27.)

In her reply, Masquat restated her arguments in support of dismissal. She also disputed TRW's standing to bring this adversary proceeding, (*Rhonda Masquat's Reply in Further Support of Motion to Dismiss Plaintiff's Adversary Complaint*, dated Nov. 7, 2014 ("*Masquat Reply*"), at ¶ 5 (ECF Doc. # 36)), citing the *TRW Decision's* ruling that TRW lacked standing to assert claims under the *Stipulation*

---

**15.** The TRW Claims are called the "Potential Claims" in the *Complaint*.

**16.** A copy of the *Assignment of Claim* is attached to a notice of transfer of claim filed on the docket of the main bankruptcy case. (*Transfer of Claim Other Than for Security*, dated June 13, 2014 (ECF/Main Case Doc. # 8304).)

and enforce the terms of the *Confirmation Order*.[17] (*Id.* at ¶¶ 1–2.)

During the initial hearing on the *Motion to Dismiss*, the Court raised the issue of its post-confirmation jurisdiction to hear the dispute, and directed the parties to provide supplemental briefing on the issue. (Transcript of the hearing held Nov. 13, 2014, at 17:6–15 (ECF Doc. # 47.) Both sides submitted supplemental memoranda, and not surprisingly, they disagreed over the Court's subject matter jurisdiction.[18]

After reviewing the pleadings and the various documents submitted by the parties, the Court informed the parties that it would treat Masquat's motion to dismiss as a motion for summary judgment, and that upon such consideration, it might grant any relief consistent with Rule 56(f) of the Federal Rules of Civil Procedure.[19] (*Notice and Order Pursuant to Fed. R. Civ. P. 12(d) and 56(f)*, dated Mar. 9, 2015 (ECF Doc. # 50).) The Court gave the parties the opportunity to present additional materials. TRW submitted additional materials, including an *Affidavit of Douglas J. Doran*, sworn to Mar. 20, 2015 ("*Doran Affidavit*").)[20] Doran signed the *Cure Agreement* on behalf of New Chrysler, and stated his understanding that New Chrysler intended that the assigned Supply Contracts were assumed and assigned in their entirety including the rights identified in paragraph 5 of the *Cure Agreement*. (*Doran Affidavit*, at ¶¶ 7, 8.) After obtaining an extension, Masquat submitted a reply that challenged the probative value of the *Doran Affidavit* and reiterated her earlier arguments.

## DISCUSSION

### A. Subject Matter Jurisdiction

▮ Before considering the summary judgment motion, the Court will address its post-confirmation jurisdiction. The bankruptcy court's subject matter jurisdiction originates with 28 U.S.C. § 1334. Section 1334(a) grants the district court original jurisdiction over all bankruptcy cases, and § 1334(b) grants the district court original but not exclusive jurisdiction over all civil proceedings arising under title 11 or arising in or related to cases under title 11. Civil proceedings arising under title 11 or arising in a case under title 11, *i.e.*, "core" proceedings, invoke

17. The standing argument is meritless and needs no further discussion. The *TRW Decision* involved TRW's effort to enforce the *Stipulation* to which it was neither a party nor a third-party beneficiary. In this adversary proceeding, TRW is asserting its rights under the *Cure Agreement* and the *Sale Order* as to which it was a party.

18. Following the close of the additional round of briefing, TRW submitted a letter from counsel for New Chrysler addressed to counsel for the Liquidation Trust that criticized the Liquidation Trust's assignment to Masquat. The letter asserted that all claims arising under the Supply Agreements, including the "unknown" claims referred to in paragraph 5 of the *Cure Agreement*, were assigned to New Chrysler as part of the sale. (*Letter from Brian D. Glueckstein, Esq. to Jeffrey B. Ellman, Esq.*, dated Dec. 11, 2014. A copy of the letter is attached as Exhibit A to the *Plaintiffs' Supplemental Statement Regarding Newly Discovered Information and in Further Support of Opposition to Motion to Dismiss*, dated Dec. 17, 2014. (ECF Doc. # 48). New Chrysler did not, however, seek to intervene in this adversary proceeding.

19. Rule 56(f) provides:

(f) **JUDGMENT INDEPENDENT OF THE MOTION**. After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

20. The *Doran Affidavit* is attached as Exhibit F to the *TRW Summary Judgment Brief*.

substantive rights under title 11 or rights that could only arise in the context of a bankruptcy case. *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 162–63 (3d Cir.2004). "Related to" or "non-core" proceedings are those whose outcome might have a "conceivable effect" on the estate. *Publicker Indus., Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir.1992); *Pacor, Inc. v. Higgins (In re Pacor, Inc.)*, 743 F.2d 984, 994 (3d Cir. 1984).

The district court may refer all cases and proceedings within its bankruptcy jurisdiction to the bankruptcy court. 28 U.S.C. § 157(a). The United States District Court for the Southern District of New York first referred its bankruptcy jurisdiction to this Court pursuant to its *Order,* No. M10–450, (S.D.N.Y. July 10, 1984), and following the Supreme Court's decision in *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), issued an amended order of reference. *See Amended Standing Order of Reference,* No. M10–468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012).

■ Although section 1334 does not expressly limit the bankruptcy court's post-confirmation jurisdiction, it is settled law that the bankruptcy court's jurisdiction "shrinks" once a chapter 11 plan is confirmed. *Penthouse Media Grp. v. Guccione (In re Gen. Media)*, 335 B.R. 66, 73 (Bankr.S.D.N.Y.2005). A party invoking the bankruptcy court's post-confirmation jurisdiction must meet two requirements. First, the plan must provide for the retention of jurisdiction over the dispute. *Hosp. and Univ. Prop. Damage Claimants v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 7 F.3d 32, 34 (2d Cir. 1993). Second, the matter must have a "close nexus to the bankruptcy plan or proceeding, as when a matter affects the

interpretation, implementation, consummation, execution, or administration of the confirmed plan or incorporated litigation trust agreement." *Resorts Int'l,* 372 F.3d at 168–69; *Gen. Media,* 335 B.R. at 73.

■ Here, the *Plan* retained jurisdiction over the proceeding commenced by TRW. Its claim relates to the assumption and assignment of the Supply Agreements, (*see Plan,* Art. VIII(A)(3)), it concerns the post-petition *Cure Agreement,* (*see id.,* Art. VIII(A)(4)), the Liquidation Trust is a defendant in the adversary proceeding, (*see id.,* Art. VIII(A)(6)) and Masquat's rights depend on the Liquidation Trust's ownership of and ability to transfer the TRW claims. (*See id.,* Art. VIII(A)(14).)

The proceeding also bears a close nexus to the *Plan* and the bankruptcy case because it affects the implementation, execution and administration of the *Plan,* the *Confirmation Order,* the *Sale Order* and the *Cure Agreement,* which was executed in connection with the sale. As noted, Masquat's ability to pursue the Indemnification Claim against TRW depends entirely on whether the Indemnification Claim was transferred to and vested in the Liquidation Trust under the *Plan* and the *Confirmation Order;* the Liquidation Trust could only assign what it had to Masquat. The answer depends, in turn, on the terms of the *Sale Order,* which ostensibly assigned the Indemnification Claim to New Chrysler, and the *Cure Agreement,* which arguably carved it out from that assignment.

Furthermore, a bankruptcy court has post-confirmation jurisdiction to interpret and enforce its prior order, and especially when the order explicitly retains jurisdiction to do so. *Travelers Indemnity Co. v. Bailey,* 557 U.S. 137, 151, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009). Here, the *Sale Order* expressly retained jurisdiction to "interpret, implement and enforce the

terms and provisions" of the *Sale Order* and the Purchase Agreement. Accordingly, the Court has subject matter jurisdiction over this dispute.[21]

## B. The Motion for Summary Judgment

Having concluded that the Court has subject matter jurisdiction, I turn to the motion. Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by FED. R. BANKR. P. 7056, governs summary judgment motions. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).[22] The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir.1995). If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party. *Matsushita Elec.*, 475 U.S. at 587, 106 S.Ct. 1348. Finally, Rule 56(f) permits the Court to grant summary judgment to the nonmov-

ant following appropriate notice and a reasonable opportunity to respond. The Court granted the parties the required notice and opportunity in its March 9, 2015 order.

The current dispute turns for the most part on the meaning of the *Cure Agreement*, and accordingly, the present motion presents a question of contract interpretation. When asked to interpret contractual language, the question is "whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir.2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir.2002)). Ambiguity presents a question of law. *Maverick Tube*, 595 F.3d at 466. A contract is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Int'l Multifoods*, 309 F.3d at 83 (internal quotation marks omitted); *accord Cont'l Ins. Co. v. Atlantic Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir.2010); *Maverick Tube*, 595 F.3d at 466. An agreement is not ambiguous if it has a definite and precise meaning, and unambiguous language does not become ambiguous because a party urges a different interpretation that strains the lan-

---

21. This conclusion does not apply to the third-party claim asserted by the Liquidation Trust against Masquat. (*Third Party Complaint*, dated Sept. 5, 2014 (ECF Doc. # 12).) The third-party claim against Masquat for legal fees and expenses incurred in connection with this adversary proceeding is based on the parties' July 2014 agreement to assign the TRW Claims.

22. The motion is governed by the amendments to Rule 56 that became effective on December 1, 2010. Although some language has changed, the standard for granting summary judgment remains unchanged and the amendments will not "affect continuing development of the decisional law construing and applying these phrases." FED. R. CIV. P. 56 advisory committee's note (2010).

guage beyond its ordinary meaning. *Maverick Tube*, 595 F.3d at 467. Where the dispute concerns a provision of the contract, the Court must consider the contract "as a whole to ensure that undue emphasis is not placed upon particular words and phrases." *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 837 N.Y.S.2d 600, 868 N.E.2d 956, 959 (2007); *accord Maverick Tube*, 595 F.3d at 467.[23]

 TRW is entitled to summary judgment if the Indemnification Claim was a "known" claim that was satisfied and extinguished (as alleged in Count One) or an "unknown" claim that was assigned to New Chrysler (as alleged in Count Two). I conclude that the Excepted Claims referenced in paragraph 5 were assigned to New Chrysler, and TRW is entitled to summary judgment on Count Two.[24]

It is beyond dispute that the parties intended that Old Chrysler would assume and assign all of its TRW contracts and orders to New Chrysler except for the five purchase orders that were specifically excluded in the *June 18 Notice*. Old Chrysler was selling all or substantially all of its operating assets to New Chrysler, liquidating, and did not need its TRW contracts. The parties were still trying to reconcile or resolve open or disputed items, and the *Cure Agreement* allowed that process to continue while TRW and New Chrysler engaged in new business. The *Cure Agreement* provided for the prompt payment of the undisputed portions of the cure, established a procedure for resolving the disputed portions and ensured that the parties would continue to operate under the assigned agreements pending the resolution of those disputes.

The *Cure Agreement* specified various categories of claims that comprised the possible cure amount. These included the Undisputed Cure Amounts (the undisputed pre-petition obligations owed to TRW and the amount owed on account of two TRW cancellation claims), (*Cure Agreement* at ¶ 2), Unvouchered Goods (charges that had not been entered on Old Chrysler's accounts payable system), (*id.* at ¶ 3), Dishonored Payments (items paid with checks that bounced, (*id.*), Post–Petition Claims, (*id.*), and Disputed Cure Amounts, consisting of alleged damages relating to a breach of the right of first refusal granted to TRW under a November 2, 2008 Letter Agreement and TRW's cancellation of certain other claims. (*Id.* at ¶ 4.)[25] New Chrysler agreed to pay the Undisputed

---

23. TRW cited New York law governing the interpretation of contracts. (*See TRW Summary Judgment Brief* at ¶¶ 15–17.) Although the Purchase Agreement was governed by New York law, (Purchase Agreement at § 11.08), Masquat contends that the *Cure Agreement*, which is silent on the subject, is governed by Michigan law. The rules governing the interpretation of contracts in Michigan and New York are essentially the same. *See, e.g., West Town Line Assocs., LLC v. Mack & Meldrum Assocs., LLC*, No. 288384, 2010 WL 785938, at *2 (Mich.Ct.App. Mar. 9, 2010) (discussing the Michigan rules governing the interpretation of a contract on a motion for summary disposition).

24. My conclusions regarding the meaning of the *Cure Agreement* generally and paragraph 5 specifically are not informed by the *Doran Affidavit*, which attested to his own understanding of what New Chrysler intended. The *Doran Affidavit* does not indicate that New Chrysler's intention was ever discussed among the parties, and the undisclosed, subjective intention of a contracting party is not probative on the issue of the contract's meaning. *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F.Supp.2d 275, 300 (S.D.N.Y.1998).

25. The *Cure Agreement* also identified specific disputes, and dealt separately with their payment. (*See Cure* Agreement at ¶ 3 (discussing the payment for past due amounts relating to plants resuming operations).)

Cure Amount on or before June 28, 2009, and upon receipt of payment, TRW agreed to withdraw its objection to the proposed cure. (*Id.* at p. 5.) New Chrysler also agreed to pay the amounts owed in connection with the Unvouchered Goods and Dishonored Payments upon reconciliation and Post–Petition Claims in the ordinary course of business.

The *Cure Agreement* also established a procedure for resolving Disputed Cure Amounts. Schedule A set out tight deadlines for discovery, briefing, motions *in limine* and trial before the Bankruptcy Court. Once the Disputed Cure Amount was resolved and became an Undisputed Cure Amount, New Chrysler would pay it within ten days. (*Id.* at ¶ 8.) Pending resolution of the disputes and payment of the undisputed amounts, TRW agreed to perform under the assigned agreements. (*Id.* at ¶¶ 6, 7.)

TRW understood that the cure amount would be reduced by offsets attributed to claims that Old Chrysler asserted against TRW, and insisted on assurances that it would have no further liability for pre-closing claims. Paragraph 5 of the *Cure Agreement* addressed TRW's demand; but for the Excepted Claims, Old Chrysler and New Chrysler acknowledged the satisfaction of any pre-closing claims against TRW. Paragraph 5 did not address the assignment of claims to New Chrysler or their retention by Old Chrysler, and nothing in its language indicated that the parties had strayed from their clearly expressed intention that Old Chrysler would assume and assign all of its contracts and orders other than the five excluded purchase orders. In fact, the *Cure Agreement* recited that all of the Agreements between Old Chrysler designated in the Assignment Notice would be assumed and as-

signed to New Chrysler, and that "[o]n and after the Closing Date, the Agreements shall be in effect between Purchaser and TRW in accordance with their terms." (*Id.* at pp. 1–2.)

Furthermore, the only reasonable interpretation of the *Cure Agreement* is the one proffered by TRW. New Chrysler had assumed Old Chrysler's liability in connection with vehicles manufactured prior to the closing in several discrete areas: factory warranties, warranties under extended service contracts, products liability claims arising from accidents, and Lemon Law claims. *Burton v. Chrysler Group, LLC* (*In re Old Carco LLC*), 492 B.R. 392, 396–97 (Bankr.S.D.N.Y.2013). Hence, New Chrysler had a continuing obligation, with limitations, to repair defects in vehicles manufactured by Old Chrysler and answer for certain product liability claims resulting in death, personal injury and property damage.

The "known" indemnification claims against TRW had already been addressed through the reconciliation process or the procedure for resolving disputed claims. The parties could not reconcile or resolve "unknown" claims. If a future need arose to repair a defective steering mechanism manufactured by TRW pre-closing under a contractual warranty, because of a recall or pursuant to a Lemon Law, or pay product liability damages, it would be reasonable for the parties to agree that New Chrysler could look to TRW for indemnification. The Excepted Claims carved out unknown warranty, product liability and recall indemnification claims against TRW as well as unknown claims relating to campaign and intellectual property infringement indemnification.

Conversely, Masquat's interpretation is supported neither by its language nor com-

mon sense. Old Chrysler was going out of business. It would not fix any steering mechanisms that became defective in the future or satisfy future products liability damage claims from the minimal assets, if any, left to the estate after the payment of higher priority claims.[26] There was no reason for Old Chrysler to retain unknown indemnification or other claims against TRW.

Accordingly, the Court concludes that the Excepted Claims were transferred to New Chrysler. While I intimated in the *TRW Decision* that Old Chrysler retained the Indemnification Claim against TRW, I was not aware of the *Cure Agreement*, and that conclusion was wrong. Finally, in light of the award of summary judgment on Count Two, it is unnecessary to reach TRW's alternative contention in Count One that the Indemnification Claim was not an "unknown" claim within the meaning of Paragraph 5.

The parties are directed to settle an order on notice and schedule a conference to discuss the disposition of the third-party claim.

IN RE ARCAPITA BANK B.S.C.(C), et al., Reorganized Debtors.

Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.(c), et al., Plaintiff,

v.

Bahrain Islamic Bank, Defendant.

Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.(c), et al., Plaintiff,

v.

Tadhamon Capital B.S.C., Defendant.

Case No. 12–11076 (SHL) (Jointly Administered)
Adv. No. 13–01434 (SHL), Adv. No. 13–01435 (SHL)

United States Bankruptcy Court, S.D. New York.

Signed April 17, 2015

---

**26.** In fact, the *Plan*, confirmed less than one year later, did not distribute any cash to the unsecured class. Instead, if the unsecured creditor class (Class 3A) accepted the *Plan*, the class received a *pro rata* share of any net proceeds recovered by the Liquidation Trust in a litigation initially brought by the Official Committee of Unsecured Creditors against Daimler AG (Adv. P. No. 09–00505). (*See Plan* at 8.) That lawsuit was subsequently dismissed. *See Liquidation Trust v. Daimler AG,* 509 Fed.Appx. 77 (2d Cir.2013).

Milbank, Tweed, Hadley & McCloy LLP, Counsel for Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.(c), et al. By: Dennis F. Dunne, Esq., Evan R. Fleck, Esq., 1 Chase Manhattan Plaza, New York, New York 10005, By: Andrew M. Leblanc, Esq., 1850 K Street, NW, Suite 1100, Washington, D.C. 20006

K & L Gates LLP, Counsel for Bahrain Islamic Bank and Tadhamon Capital B.S.C. By: John A. Bicks, Esq., Lani A. Adler, Esq., 599 Lexington Avenue, New York, New York 10022

### *MEMORANDUM OF DECISION*

SEAN H. LANE, UNITED STATES BANKRUPTCY JUDGE

Before the Court are motions to dismiss filed by Bahrain Islamic Bank ("BisB") and Tadhamon Capital B.S.C. ("Tadhamon," and together with BisB, the "Defendants"), respectively, in the above-captioned adversary proceedings. The adversary proceedings were brought by the official committee of unsecured creditors for the above-captioned chapter 11 cases (the "Committee"). The cases seek the turnover of funds invested by the Debtor Arcapita Bank—a Bahraini investment bank—with the Defendants—two Bahraini entities—just before the bankruptcy filing. Because the motions in the two cases raise the same issues, the Court will address them together. The Defendants make several arguments for dismissal, including that the Court lacks personal jurisdiction over the Defendants. For the reasons set forth below, the motions are granted for lack of personal jurisdiction.

### *BACKGROUND*

Arcapita Bank B.S.C.(c) ("Arcapita"), one of the above-captioned reorganized

debtors, is licensed as an Islamic wholesale bank by the Central Bank of Bahrain. BisB Compl. ¶ 12; Tadhamon Compl. ¶ 12. Headquartered in Bahrain, Arcapita is operated as an investment bank and is a global manager of Shari'ah compliant alternative investments. BisB Compl. ¶ 12; Tadhamon Compl. ¶ 12. Prior to its bankruptcy filing, Arcapita and its affiliates employed 268 people and, together with the debtors and their non-debtor subsidiaries, maintained offices in Bahrain, Atlanta, London, Hong Kong and Singapore. BisB Compl. ¶ 12; Tadhamon Compl. ¶ 12.

Defendant BisB is an Islamic commercial bank headquartered in Bahrain. BisB Compl. ¶ 13. BisB maintains correspondent bank accounts in the United States with Deutsche Bank, Standard Chartered Bank and JP Morgan Chase Bank. BisB Compl. ¶ 14. As required by the Patriot Act, BisB has designated an agent for service of process in the United States in connection with these accounts. BisB Compl. ¶ 14. BisB also participates in the Clearing House Interbank Payments System, located in New York. BisB Compl. ¶ 14.

Defendant Tadhamon is a Bahraini corporation and a subsidiary of Tadhamon International Islamic Bank ("TIIB"), a Yemeni bank that offers Islamic banking and investment services to customers in Yemen and abroad. Tadhamon Compl. ¶ 13. Tadhamon serves as the investment arm of TIIB. Tadhamon Compl. ¶ 13. While Tadhamon does not maintain any

correspondent accounts in the United States, *see* Hr'g Tr. 62:19–21 (March 19, 2014), TIIB has correspondent bank accounts in the United States with Mashreq Bank and the Bank of New York Mellon. Tadhamon Compl. ¶ 14. As required by the Patriot Act, TIIB has designated an agent for service of process in the United States in connection with each of these accounts and also participates in the Clearing House Interbank Payments System in New York. Tadhamon Compl. ¶ 14.

According to the Defendants, they do not and have never maintained offices, staff or telephone numbers in the United States. Decl. of Waleed Rashdan ¶ 2 [Tadhamon ECF No. 8]; Decl. of Mohammed Ebraim Mohammed ¶ 2 [BisB ECF No. 8]. The Defendants maintain that they do not do business in the United States, do not solicit business or clients in the United States and do not advertise in the United States. Rashdan Decl. ¶ 2; Mohammed Decl. ¶ 2. Neither Defendant has filed a proof of claim in the debtors' cases.

## A. *The Placements*

A few days prior to its bankruptcy filing, Arcapita made several discrete short-term debt investments through the Defendants (the "Placements"). BisB Compl. ¶¶ 27, 30; Tadhamon Compl. ¶¶ 27, 31. The Placements were made under two separate investment agreements between Arcapita and each of the Defendants (the "Placement Agreements"). *Id.*[1] Both of the

---

1. Arcapita and BisB entered into their Placement Agreement on July 10, 2003. BisB Compl. ¶ 23. Arcapita made at least five previous investments with BisB under the terms of the Placement Agreement in the two years before the investments here were made. BisB Compl. ¶ 26. These previous transfers are not relied on by the Committee as a basis for personal jurisdiction. Indeed, the Committee states that "Arcapita did not enter into placement transactions with [BisB] as part of

the ordinary course of business." BisB Compl. ¶ 25. Accordingly, the Court does not address these previous transfers as part of its jurisdictional analysis.

Arcapita and Tadhamon entered into their Placement Agreement on March 15, 2012. Tadhamon Compl. ¶¶ 22–23. The Committee does not allege that Arcapita had placed any investments with Tadhamon prior to the

### B. Bankruptcy Case

Less than a month after these Placements, Arcapita filed for protection under Chapter 11 of the Bankruptcy Code. On April 5, 2012, the U.S. Trustee appointed an official committee of unsecured creditors pursuant to Section 1102(a) of the Bankruptcy Code (the "Committee" or the "Plaintiff"). All of the Placements matured within a month after Arcapita's bankruptcy filing.[2] Both Defendants, however, failed to deliver the Placement Proceeds to Arcapita. BisB Compl. ¶¶ 32, 34; Tadhamon Compl. ¶¶ 35, 38. Instead, the Defendants informed Arcapita that, under

---

transactions in question. Tadhamon Compl. ¶¶ 22–23.